SIERRA CLUB, et al., Plaintiffs,

v.

John O. MARSH, Jr., et al., Defendants.

Civ. No. 88-0116-B.

United States District Court, D. Maine.

Nov. 1, 1989.

---

See also 907 F.2d 210.

Edward F. Lawson, Weston, Patrick, Willard & Redding, Boston, Mass., John C. Page, Zuckerman, Avaunt & Devine, Gray, Me., for plaintiffs.

Charles J. Sheehan, Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for Marsh, Rhen, Burnley and Richardson.

Michael M. Dubose, Asst. U.S. Atty., Bangor, Me., for U.S.

Thomas G. Reeves, Janet Myers, Chief Counsel, Legal Div., Maine Dept. of Transp., Augusta, Me., John Quarles, Anthony C. Roth, Leslie S. Ritts, Washington, D.C., for Maine Dept. of Transp.

## MEMORANDUM OPINION AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT ON NEPA CLAIMS

CYR, Chief Judge.

The plaintiffs, Sierra Club and two of its members, request declaratory and injunctive relief suspending federal permits issued for the construction of a marine dry cargo terminal on Sears Island in Penobscot Bay. Plaintiffs contend that permits issued by the United States Army Corps of Engineers [the Corps] and by the United

States Coast Guard [the Coast Guard], as well as Federal Highway Administration [FHwA] funding, must be suspended due to failure to comply with the Clean Water Act [CWA], 33 U.S.C. § 1251 *et seq.*, the National Environmental Policy Act [NEPA], 42 U.S.C. § 4321 *et seq.*, and section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401. The court now considers the cross-motions for summary judgment on the NEPA claims.

## I. BACKGROUND

The Maine Department of Transportation [MDOT] proposal to develop a marine dry cargo terminal on Sears Island has been the subject of protracted litigation.[1] The court observed the most recent installment in the litigation on May 10, 1989, by granting plaintiffs' motion for preliminary injunctive relief on the basis of three of their *NEPA* claims. *See Sierra Club v. Marsh*, 714 F.Supp. 539 (D.Me.1989) [*Sierra Club IV*]. The court found a likelihood of irreparable injury from inadequate compliance with the NEPA requirements relating to the analysis of "secondary impacts," the analysis of "reasonable alternatives," and the preparation of a supplemental environmental impact statement [EIS]. *See id.* at 582–587. The court found that the balance of harms favored the plaintiffs and that the public interest would be better served by maintaining the *status quo* pending agency recourse to the NEPA process. *Id.* at 591–93. The court enjoined the permitting, funding and construction of the project

pending further order, or pending compliance by the FHwA and the Corps with

a) the NEPA requirement of an adequate evaluation of all reasonably foreseeable secondary impacts of developing a cargo terminal on Sears Island;

b) the NEPA requirement of evaluation of all reasonable alternatives to the proposed project; and

c) the NEPA requirement that all new information be assessed with a view to determining whether its environmental significance requires preparation of a supplemental EIS.

Order Amendment Preliminary Injunction, June 1, 1989, at 2.

On July 6, 1989, the court granted the federal defendants' unopposed motion to supplement the record. The court now considers the cross-motions for summary judgment on the three NEPA claims in light of the supplemented record.

## II. DISCUSSION

### 1. *"Secondary Impact" Analysis*

■ NEPA regulations require that an EIS discuss both the direct and indirect (or secondary) impacts of a proposed project. *See* 40 C.F.R. § 1502.16. Indirect impacts are those "caused by the action [that] are later in time or farther removed in distance [than the direct impacts], but are still *reasonably foreseeable*."[2] *Id.* at § 1508.8 (emphasis added). Whether a particular impact is to be regarded as "definite enough to take into account, or too specu-

---

**1.** In the first round of litigation, the United States Court of Appeals for the First Circuit held that the proposed Sears Island project would have significant environmental impacts and that an environmental impact statement [EIS] was required by NEPA. *See Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir.1985) [*Sierra Club I*]. The court of appeals further held that the Coast Guard had acted arbitrarily and capriciously in classifying the proposed causeway between the mainland and Sears Island as a "bridge." *See Sierra Club v. Secretary of Transportation*, 779 F.2d 776 (1st Cir.1985).

In the course of the present round of litigation, this court originally denied plaintiffs' motion for preliminary injunctive relief. *See Sierra Club v. Marsh*, 701 F.Supp. 886 (D.Me.1988), *vacated and remanded*, 872 F.2d 497 (1st Cir. 1989). The First Circuit vacated this court's decision on the ground that agency failure to gather and consider the information required

by NEPA may warrant injunctive relief even absent evidence of environmental harm. *See Sierra Club v. Marsh*, 872 F.2d 497, 502–504 (1st Cir.1989). [*Sierra Club III*]. On remand, this court granted a preliminary injunction against further project development pending compliance with NEPA. *See Sierra Club v. Marsh*, 714 F.Supp. 539 (D.Me.1989) [*Sierra Club IV*].

**2.** Section 1508.8 further provides:

Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures,

lative to warrant consideration, reflects several different factors." *Sierra Club I,* 769 F.2d at 878. In determining whether an agency decision not to discuss particular impacts is "arbitrary and capricious,"[3] the court is to consider—

> With what confidence can one say that the impacts are likely to occur? Can one describe them 'now' with sufficient specificity to make their consideration useful? If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision?

*Id.* (citing *Commonwealth of Massachusetts v. Watt,* 716 F.2d 946, 952–53 (1st Cir.1983)).

The final EIS [FEIS] devotes 47 pages to an analysis of reasonably foreseeable secondary impacts of the Sears Island project.

FEIS, Vol. I, at 4–108—4–154. The analysis is based on the assumption that the only reasonably foreseeable tenants of the planned industrial park are manufacturers of fabricated metal products, non-electrical machinery and equipment, electrical and electronic machinery and equipment, and transportation equipment.[4] *See* FEIS, Vol. I, at 4–109, 4–110. The FEIS assumes that these industries will have no significant air or water impacts. *See id.* at 4–117, 4–120. These industries were selected for secondary impact analysis because

> the targeted industries have been proposed for attraction by both public officials and the property owners (and are, therefore, reasonably foreseeable), and would not likely occur on Sears Island or Mack Point without the proposed action (and would, therefore, be attributable to it).

*Id.* at 4–111.

Plaintiffs argue that the agency decision to restrict the secondary impact analysis to

---

> and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8.

3. In *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989), the Supreme Court resolved a dispute among the circuits and established that judicial review of an agency's compliance with NEPA is controlled by the "arbitrary and capricious" standard in section 706(2)(D) of the Administrative Procedure Act, 5 U.S.C. § 706. In so holding, the Court noted that there was little practical difference between the "arbitrary and capricious" standard and the "reasonableness" standard applied in some circuits, and, therefore, that "a substantial reworking of long-established NEPA law" would not be required. *Oregon Natural Resources Council,* 109 S.Ct. at 1861 n. 23.

Judicial review of agency compliance with NEPA is "quite narrow in scope." *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980). In reviewing agency compliance with NEPA's substantive requirements the court may only determine whether the agency gave good faith consideration to the environmental consequences of the action; the court may not pass judgment on the balance struck by the agency. *See Roosevelt Campobello International Park Commission v. United States Environmen-*

*tal Protection Agency,* 684 F.2d 1041, 1045 (1st Cir.1982). Similarly, the court may set aside an EIS *only* for serious violations of the procedures mandated by NEPA. *See Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 3 (1st Cir.1981) (citing *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).

4. These industries were targeted for marketing efforts in a report prepared for the Town of Searsport by Mallar Associates. *See* Mallar Associates, A Municipal Response Plan for the Industrial Development of Sears Island (1983) [Mallar Report]. The Mallar Report was based on the 1980 Land Use Plan/Industrial Marketing Study [Land Use Plan] prepared for Bangor Investment Company [BIC], which owns the rest of Sears Island. *See* Mallar Report, at 3.

> In the Land Use Plan
> [a] wide variety of national growth industries were ranked on the basis of compatibility with a location such as Searsport, potential use of port related transportation, growth rate in employment in the industry, the stability of the industry, wage levels, minimum environmental impacts, and use of the area labor force and of local products and services.

*Id.* On the basis of these rankings, the Land Use Plan concluded that the four targeted industries "could best use the opportunities offered by Sears Island, the cargo port, and the surrounding area and in turn offer the most benefit to the Searsport area." *Id.*

these four target industries was "arbitrary and capricious," because there is evidence in the administrative record that "heavy" industries, with significant air and/or water impacts, are foreseeable tenants of the industrial park. The court ruled that the record did not evidence FHwA consideration of the prospect that industries other than the "light-dry" type targeted in the Mallar Report might locate in the industrial park.

> Although it is conceivable that a careful consideration of all available information could have enabled the FHwA rationally to conclude that the Mallar Report presented a logical basis for determining which industries were "reasonably foreseeable" and could be attributable to the Sears Island port project, the court cannot determine from the record that any such FHwA decision was "founded on a reasoned evaluation of the relevant information." *Oregon Natural Resources Council,* 490 U.S. at ——, 109 S.Ct. at 1865.

*Sierra Club IV,* 714 F.Supp. at 565.

Since an agency decision will be upheld only if it is "rational, based on consideration of the relevant factors, and within the scope of [the agency's authority]," *Motor Vehicle Manufacturing Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983), the court found that plaintiffs had established a likelihood of success on the merits of this claim. The court considered record evidence which

seemed to indicate that it was foreseeable that food, forest product, and other "nonlight-dry" industry, would locate near the port project. *See Sierra Club IV,* 714 F.Supp. at 564–65 (citing *Sierra Club I,* 769 F.2d at 878 (quoting 1983 Environmental Assessment [EA] prepared for MDOT: "several forest product and food industries are also expected to have facilities on [Sears] [I]sland"); Wallace, Floyd, Associates, Inc. Sears Island Master Plan, Final Report (1985), at 20–21 (Sears Island "[g]ood location for manufacturing based on wood products exported via [the] state pier (e.g. waferboard production)"); Report of Advisory Committee on Coastal Development and Conservation, FEIS, Vol. I, at A–2, 2–3 (targeting Searsport as an area for "heavy" industrial development); Letter from State Development Office, FEIS, Vol. II, at 5–2 (Sears Island industrial "park is intended for heavy industry")). The court found that certain meeting notes [5] and an FHwA affidavit,[6] to which the defendants cited, did not demonstrate that the FHwA considered, much less evaluated, the foreseeability of attracting to the industrial park food or forest product industries, or other *non*light–dry industries (except power generation and aluminum smelter industries). *See Sierra Club IV,* 714 F.Supp. at 564–65.

In response to the preliminary injunction, defendants filed three affidavits aimed at supplementing and elucidating the administrative record.[7] *See* Supplemental Affida-

---

**5.** The defendants cited notes summarizing a February 13, 1986, meeting attended by the FHwA, the Corps and Francis Mahady of Economic Research Associates [ERA], among others. The meeting notes state that the "issue of secondary impacts was discussed in detail," but also state that ERA, a consultant engaged by MDOT, *"will* be preparing a special report on Secondary Impacts," based on the Mallar Report, the master plan for Sears Island prepared for BIC, and *"other* [available] *information."* FHwA Record, Vol. II–13 (emphasis added). The court noted that

> The ERA *Special Report is not included in the administrative record made available to the court,* nor can the court locate anything in the administrative record which identifies the 'other information' apparently available at the February 1986 meeting.

*Sierra Club IV,* 714 F.Supp. at 564 (emphasis in original).

**6.** In an affidavit, William Richardson, FHwA Division Administrator, stated that he

> reviewed that [Mallar] report and the MDOT rational (sic) for the selection of the four industries to be considered under secondary impacts. I discussed the issue with [Steve] Ronning [environmental policy specialist with FHwA] and [Bruce] Mattson [environmental engineer with FHwA] and I decided that the approach was reasonable.
> Richardson Aff. at ¶ 22.

**7.** Plaintiffs contend that the affidavits must be stricken as *post hoc* rationalizations. The "focal point" for judicial review of an agency decision is the administrative record, "not some new record made initially in the reviewing court."

vit of Francis Mahady [Mahady Supp. Aff.]; Supplemental Affidavit of William Richardson [Richardson Supp. Aff.]; Affidavit of Leslie Stevens [Stevens Aff.]. The Mahady and Richardson affidavits satisfactorily explain the confusion concerning the "missing" EPA Special Report,[8] *see* Mahady Supp. Aff. at ¶¶ 6–7; Richardson Supp. Aff. at ¶¶ 8–11, and these affidavits also describe the method used to determine the types of industries selected for FEIS "secondary impact" analysis, and the apparent shift away from the types of industrial

tenants anticipated at the time of the preparation of the 1983 EA,[9] *see* Mahady Supp. Aff. at ¶ 13.

The Mahady supplemental affidavit articulates a rationale for the conclusion that the FEIS "secondary impact" analysis treats only "light, dry industries." *See id.* at ¶¶ 9–11, 14. A key factor in the selection of an industry for "secondary impact" analysis was the recognition that "industries locating in the industrial park had to be those which do not require substantial water and sewer capabilities in order to

---

*Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). But where "there was such a failure to explain administrative action as to frustrate judicial review," *id.,* the court may obtain further explanation from the agency for the limited purpose of "ascertaining whether the agency considered all the relevant factors or fully explicated its ... grounds of decision." *Asarco, Inc. v. United States Environmental Protection Agency,* 616 F.2d 1153, 1160 (9th Cir.1980). The new material "should be merely explanatory of the original record and contain no new rationalizations." *Environmental Defense Fund, Inc. v. Castle,* 657 F.2d 275, 285 (D.C.Cir.1981). If the agency decision, "once explained by the proper agency official, is not sustainable on the record itself, the proper judicial approach [is] to vacate the action and remand back to the agency." *Id. See Camp v. Pitts,* 411 U.S. at 143, 93 S.Ct. at 1244; *Asarco, Inc.,* 616 F.2d at 1160.

The affidavits submitted by the defendants explain apparent gaps and otherwise clarify the administrative record; thus they are admissible under *Camp v. Pitts.* To the extent that the affidavits contain *post hoc* rationalizations, they are viewed "critically." *Citizens for Reasonable Expansion, Inc. v. Dole,* 770 F.2d 423, 434 (5th Cir.1985) (citing *Louisiana v. Lee,* 758 F.2d 1081, 1085 (5th Cir.1985), *cert. denied,* 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986)).

8. Although the FHwA summary of the February 12, 1986, meeting states that a special report "*will* be prepared," FHwA Record, Vol. II, at 13, in fact no separate report was prepared. *See* Richardson Supp. Aff. at ¶ 10; Mahady Supp. Aff. at ¶ 6. Instead, in consultation with another MDOT consultant, ERA prepared a study in "camera ready" form to allow direct incorporation into the EIS. *Id.* In the preparation of this report ERA relied primarily on the Mallar Report, the Land Use Plan prepared for BIC, and the 1981 "Economic Adjustment Strategy for Waldo County," prepared for the Eastern Maine Development District. Mahady Supp. Aff. at ¶ 7. Other information available to ERA included:

(a) December 30, 1977 Report to the Governor's Advisory Committee on Coastal Conser-

vation and Development[,] entitled "Where Should Heavy Industry Be Sited In Coastal Maine?";

(b) January, 1978 report for the Maine Department of Transportation and the Maine State Planning Office prepared by Fay, Spofford & Thorndike, Inc., with assistance from ERA, entitled "Feasibility Study of the Development of Cargo Handling Facilities at Maine Ports";

(c) September, 1978 Fay, Spofford & Thorndike, Inc. report for the Maine Department of Transportation[,] entitled "Supplement to Report on Cargo Port Alternatives";

(d) 1978 supplemental report by Fay, Spofford & Thorndike for the Maine Department of Transportation[,] entitled "Supplement to Report on Cargo Port Alternatives";

(e) October, 1978 Report to the Governor by his Advisory Committee on Coastal Development and Conservation[,] entitled "The Maine Coast: Issues Considered";

(f) March, 1980 Technical Report for Maine Department of Transportation by Booz–Allen & Hamilton[,] entitled "Feasibility Study of General Cargo Port Facilities in Maine"; and

(g) January, 1985 Final Report by Wallace, Floyd Associates, Inc. prepared for Bangor Investment Company[,] entitled "Sears Island Master Plan," and consisting of three volumes.

*Id.*

9. The 1983 EA prepared for MDOT stated that it was "expected" that forest product and food industries would locate facilities on Sears Island. *See Sierra Club IV,* 714 F.Supp. at 565. The FEIS did not consider food or forest product *manufacturing* because "primary manufacturing production facilities ... tend to be located in as close a proximity as possible to their raw materials." Mahady Supp. Aff. at ¶ 13. Instead, agency decisionmakers determined it most likely that these industries would utilize *storage* facilities in the port complex itself. The FEIS considered the impacts related to the storage of forest and food products in its discussion of the direct impacts of the project. *See* FEIS, Vol. I, at 2–12, §§ 4.4.2, 4.8.2.

function," because existing sewer and water facilities would be inadequate.[10] *Id.* at ¶ 10. Mahady ruled out industries whose water and sewage needs would require substantial new infrastructure improvements because no such work was either planned as part of the project or "proposed or reasonably likely to occur independently through actions by the State, Waldo County, Searsport, or BIC," and because such infrastructure improvements would "require so large a capital investment [that] their initiation would not occur as a result of the proposed port project." *Id.* Mahady considered the "highly competitive nature of industrial park development" as well, and he concluded that the only industries likely to be drawn to Sears Island would be those acceptable to the local population. *Id.* at ¶ 11. Mahady reviewed this analysis in meetings with MDOT, FHwA and others,

> giving [his] conclusions about the validity of the screening process and recommending that the EIS utilize the specified light, dry industries in its secondary impacts analysis. My proposed scope of services and logic for the analysis were accepted by the FHWA and I proceeded with my work accordingly.

*Id.* at ¶ 14.

The Richardson supplemental affidavit articulated the rationale for the FHwA decision that the EIS need only consider impacts related to "light" industrial development.

> As a result of the meetings I attended on the scoping and preparation of the EIS, and including the February 12, 1986 meeting . . ., I understood that the analysis by Economic Research Associates ("ERA") of industrial development as a secondary impact of the port project would be based upon the work previously done in the Land Use Plan and the Municipal Response Plan (FHWA Record at

Volume I–23 (p. 9) and I–26 (pp. 8–9); see also Volume I–28 (pp. 39–42, 59), Volume I–29, Volume II–3).

> At the February 12, 1986 meeting, Frank Mahady of ERA discussed the evolution of the Sears Island development proposals and what he intended to do in terms of using the findings of the earlier reports in his secondary impacts analysis. (FHWA Record at Volume II–12 and II–13). Based upon my previous participation in meetings on this issue, upon my review of the Municipal Response Plan [Mallar Report], upon Mahady's February 12, 1986 presentation and upon the ensuing discussion among attendees at that February 12th meeting, I thought the choice to be reasonable and sensible. The light, dry industries identified and discussed in the Final EIS (Final EIS at 4–109 to 4–111) appeared to me to be the most probable types of users *in light of the various physical and environmental limitations* which have to be taken into account in developing Sears Island.

Richardson Supp. Aff. at ¶¶ 5–6 (emphasis added).

The scope of judicial review of an agency decision to subject particular industries to "secondary impact" analysis is narrow. Although the court must engage in a "thorough, probing, in-depth review," *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), to "satisfy itself that the agency has made a reasoned decision based on its evaluation" of the information before it, *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989), the court may not substitute its own judgment for the agency's conclusion, *see Bowman Transportation, Inc. v. Arkansas Best–Freight Systems,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974) (citing *Citizens to*

---

**10.** Plaintiffs challenge the credibility of the Mahady affidavit representation that water supply and waste disposal problems preclude "heavy" industry. Plaintiffs assert that the Mallar Report indicates that one million gallons of water per day could be provided to Sears Island. Mallar Report, at 27. However, the Mallar Report states that "major facility improvements would

be required at considerable cost" to provide a million gallons of water a day. *Id.* Plaintiffs offer no evidence to rebut Mahady's conclusion that the large capital expenditures required for such improvements would render independent action unlikely on the part of the State, Waldo County, or the Town of Searsport. Mahady Supp. Aff. at ¶ 10.

*Preserve Overton Park*, 401 U.S. at 413, 91 S.Ct. at 822). In this "highly deferential" mode, *see Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 34 (D.C.Cir. 1976), the court may accept "less than ideal clarity in administrative findings, if the agency's path may be reasonably discerned," *Kurzon v. United States Postal Service*, 539 F.2d 788, 793 (1st Cir.1976), provided the decision "is supported by a rational basis," *Conservation Law Foundation of New England, Inc. v. Secretary of the Interior*, 864 F.2d 954, 958 (1st Cir. 1989).

The court previously found that there was no evidence that the FHwA had considered whether other industries were foreseeable tenants of the industrial park, "[c]onsequently there [was] no record upon which to assess whether it was rational to conclude that [other] types of industries [were] too speculative to require secondary impact analysis." *Sierra Club IV*, 714 F.Supp. at 565 n. 33. The supplemental affidavits submitted by the defendants remedy these record deficiencies.[11]

The Mahady supplemental affidavit describes the particular screening process used by ERA to identify "reasonably foreseeable" industrial park tenants, a "key factor" being whether a prospective tenant's water and sewer treatment needs could be met without major improvements in the infrastructure. *See* Mahady Supp. Aff. at ¶ 10. Food and forest product *manufacturers* were eliminated on the ground that their industrial processes would require greater water and sewer treatment capability than could be provided under the existing infrastructure. *See id.*

at ¶ 13. The Richardson supplemental affidavit likewise reveals that the screening process was circumscribed in recognition of the physical and environmental limitations of Sears Island as an industrial development site. Richardson Supp. Aff. at ¶ 6. Richardson evaluated the Mahady rationale, the Mallar Report, the comments of others, and the FEIS, and determined that the Mahady approach to industry selection for "secondary impact" analysis was "reasonable and sensible." *Id.* at ¶¶ 6, 11.

■ Whether the court would have weighed the available information in the same manner is not the issue; the court may not substitute its judgment for that of the agency. *See Bowman Transportation, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42. Nor is it necessary that all record data support the agency decision.[12] *See Environmental Coalition of Broward County v. Myers*, 831 F.2d 984, 986 (11th Cir.1987) (citing *Bowman Transportation*, 419 U.S. at 285–86, 95 S.Ct. at 441–42). It is enough that the defendants have articulated a rational basis for determining that the light-dry industries targeted in the Mallar Report are reasonably foreseeable tenants of the Sears Island industrial park and that food and forest product manufacturers, and other "heavy" industries, are not. There is considerable credible evidence to support these reasoned decisions. *See, e.g.,* ERA Economic Adjustment Strategy for Waldo County (1981), at II–33, IV–3; Mahady Supp. Aff. at App. A (incorporated in FEIS by reference, explaining that forest product manufacturers usually locate close to raw material); Land Use Plan, at 3 (same); Mallar Report, at 28–30 (detailing

---

**11.** Plaintiffs argue that the record deficiencies disclosed in the course of the preliminary injunction proceedings may not be corrected by means of affidavits, citations to memoranda, or studies not incorporated in the FEIS. They contend that compliance with NEPA must be evaluated *solely on the information contained in the FEIS* and circulated to the public. *See Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir.1980). Although the administrative record may not be used to correct deficiencies in the EIS, it may be used to determine whether the FEIS is inadequate in the first instance. In *Sierra Club IV*, 714 F.Supp. at 565,

the court concluded that the present administrative record was so incomplete as to render judicial inquiry into the adequacy of the FEIS infeasible. These affidavits may be examined with a view to determining whether that conclusion is still warranted. *See note 7 supra.*

**12.** Plaintiffs argue that the statement in the 1985 Sears Island Master Plan—that Sears Island would be a good location for waferboard production—makes it foreseeable that such industry will locate on Sears Island. However, defendants have articulated a reasoned basis for excluding the waferboard industry from analysis. Mahady Supp. Aff. at ¶ 10.

Sears Island water and waste disposal limitations).

The court accordingly affirms the agency decision. *Accord Bowman Transportation*, 419 U.S. at 285, 95 S.Ct. at 441–42; *Conservation Law Foundation*, 864 F.2d at 958; *Environmental Coalition*, 831 F.2d at 986.

### 2. *"Reasonable Alternatives" Analysis*

NEPA requires that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). If an EIS is required, it must include an analysis of all reasonable alternatives to the proposed action. *Id.* at § 4332(2)(C)(iii).

The NEPA regulations identify the function and importance of the "reasonable alternatives" analysis, as well as its form, scope and content.

This [alternatives] section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

Plaintiffs challenge the "reasonable alternatives" analysis in the present FEIS as "arbitrary and capricious," on the ground that it discusses only a two-berth terminal facility capable of expansion to six berths (fully expandable facility). In view of information that it may not be necessary to build, economically feasible to operate, or possible to fund, more than two-berths, plaintiffs contend that it was unreasonable to restrict the "reasonable alternatives" analysis to the *fully expandable* terminal option. Although the court found in *Sierra Club IV*, 714 F.Supp. 572–82, that the FHwA had established a rational basis for not considering a *nonexpandable* two-berth terminal facility, located either at Mack Point or at Sears Island, the court opined that the FHwA had failed "to *evaluate* the alternative of a two-berth Sears Island terminal *expandable* to less than six berths [partially expandable facility]." *Id.* at 582 (emphasis in original) (footnote omitted).

The defendants now argue that it would be inappropriate to remand for agency analysis of the reasonableness of a partially expandable facility because that alternative was never proposed during the EIS process and a partially expandable facility represents merely an intermediate stage in the development of a fully expandable facility whose environmental impacts already have been analyzed. Therefore, the defendants argue, the alternative of a partially expandable terminal does not require separate analysis.

### a. Timeliness of Alternative Proposals

Relying on *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), and its progeny, the defendants argue that the EIS may not be

held inadequate for failure to evaluate a partially expandable facility on Sears Island because the only alternative specifically put forth during the EIS process was a two-berth *nonexpandable* facility at Mack Point.

In *Vermont Yankee* the Supreme Court stated that "common sense" dictates that the " 'required statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable to man." 435 U.S. at 551, 98 S.Ct. at 1215. Instead, the "concept of alternatives must be bounded by some notion of feasibility," and the agency may not be held accountable for a failure to "ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Id.* The Court made it clear that it was "incumbent" upon participants in the NEPA process "to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Id.* at 553, 98 S.Ct. at 1216.

The lower courts as well have been critical of attempts to force remand for agency consideration of issues inadequately identified during the administrative proceedings. *See, e.g., Roosevelt Campobello,* 684 F.2d at 1047 ("In order to preserve an alternatives issue for review, it is not enough to simply make a facially plausible suggestion; rather an intervenor must offer tangible evidence that an alternative ... might offer a 'substantial measure of superiority' "); *Kentucky ex rel. Beshear v. Alexander,* 655 F.2d 714, 718–19 (6th Cir.1981) (meaningful administrative participation not shown unless agency informed in time to take corrective action); *Seacoast Anti–Pollution League v. Nuclear Regulatory Commission,* 598 F.2d 1221, 1228–30 (1st Cir.1979) (same); *Woida v. United States,* 446 F.Supp. 1377, 1389 (D.Minn.1978) (noting that no one submitted comments during DEIS comment period). *Cf. Northside Sanitary Landfill, Inc. v. Thomas,* 849 F.2d 1516, 1519 (D.C.Cir.1988) (plaintiff's response to proposed rulemaking did not put agency on notice of specific objections).

Similarly, in *Roosevelt Campobello, supra,* where the agency restricted its analysis of alternative oil refinery sites to sites in the State of Maine, but no commentator had proposed a specific alternative site, the First Circuit noted that

> [o]ne alternative—a monobuoy off the mid-Atlantic coast—was raised for the first time at the adjudicatory hearing, too late for inclusion in the EIS. Although petitioners now contend that EPA *should* reasonably have been aware of such an alternative earlier, their citation to a 1976 study by the Office of Technology falls far short of persuading us; nor have they explained their failure to bring the report to EPA's attention in a timely manner.

684 F.2d at 1047. *See also Northside Sanitary Landfill,* 849 F.2d at 1519 (challenger submitted 420 pages of documents to agency, but "made no attempt to specify *why* it considered those documents or anything in them relevant to the rulemaking procedure"); *Kentucky ex rel. Beshear,* 655 F.2d at 717 (no commentator argued at *any* time prior to litigation that "alternatives" analysis was inadequate); *Seacoast Anti–Pollution,* 598 F.2d at 1229 ("We think it ... relevant that petitioners have in these proceedings played dog in the manger with respect to alerting the agency to reasons why [certain sites] might be advantageous for the proposed nuclear plant"); *Woida,* 446 F.Supp. at 1389 (no governmental agency or member of public submitted comments concerning adequacy of DEIS).

In the present case no one proposed the option of a partially expandable terminal facility. But the record indicates that the EIS preparers were informed that project opponents contended that NEPA required consideration of a smaller terminal facility. During the scoping meeting, at the beginning of the EIS process, Nancy Stone, a Sierra Club member, asked "[i]f the needs study says a project *not as large as now* proposed would accommodate the expected traffic, wouldn't that point be considered an alternative." Transcript, EIS Scoping Meeting, at 47 (Dec. 5, 1985), FHwA Record, Vol. I, at 28. Stone added that

"[i]t's quite obvious that alternative sites, the selection of alternative sites *or principals of design* must depend on what the evidence shows." *Id.* (emphasis added). *See also* Letter from EPA, Dec. 13, 1985, FHwA Record, Vol. I, at 30 (commenting on scoping meeting and stating that "[a]lternative sites should be evaluated on their ability to satisfy project need, i.e., providing the State with a modern cargo port and recapturing export trade, not on how well they accommodate a design developed for the Sears Island site"). The EPA provided the EIS preparers with two reports prepared by Temple, Barker & Sloane [TBS] *before* the FEIS was approved by the FHwA. *See* FHwA Record, Vol. III, at 10; Corps Record, Vol. II, at 10. These TBS reports challenged the cargo volume forecast prepared by MDOT's consultant, Booz–Allen and Hamilton [Booz–Allen]. Finally, during the FEIS comment period Sierra Club advised the EIS preparers that

> [t]he discussion of alternatives in the EIS is deficient because it is based upon a six berth configuration. As discussed above, the EIS acknowledges that cargo projections beyond the 126,000 ton figure are "somewhat speculative". Given this situation, *it is improper for the EIS to compare Mack Point and Sears Island using a six berth configuration.* Because there is no reasonable expectation that six berths will ever be required, the comparison of alternatives lacks any rational basis.

FHwA Record, Vol. III, at 28 (emphasis added).

The participation of the commentators in the present case appears to have exceeded the level of participation found lacking in the cases relied on by the defendants. For example, although the commentator in *Vermont Yankee* suggested "energy conservation" as an alternative to nuclear powerplant construction, the commentator not only failed to "further focus its contentions," despite inquiry from the Atomic Energy Commission, it "virtually declined to

participate." 435 U.S. at 554, 98 S.Ct. at 1217.[13] The Court in *Vermont Yankee* cautioned that "administrative proceedings should not be a game or forum to engage in unjustified obstructionism by making vague and obscure" requests that the agency "embark upon an exploration of uncharted territory," and then, "after failing to do more to bring the matter to the agency's attention, seek[] to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Id.* at 543–44, 98 S.Ct. at 1211–12.

NEPA regulations place agency decisionmakers under an affirmative duty to "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a). Although the duty to explore and evaluate does not extend to "every alternative device and thought conceivable by the mind of man," *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. at 1215, it does apply to all plausible alternatives prominently presented in a timely manner during the EIS process.

■ The present record reflects that the EIS preparers were placed on timely notice that an EIS analysis focusing exclusively upon a fully expandable terminal facility was unwarranted by cargo-volume forecasts and would not satisfy the requirements of NEPA. *See* FHwA Record, Vol. I, at 28 (Sierra Club comments); *id.* at 30 (comments by EPA); *id.*, Vol. III, at 10 (TBS criticism of cargo projections); *id.* at 28 (Sierra Club letter). Nevertheless, these comments did not focus upon whether the terminal should be a *partially expandable* facility, but whether it should be a *nonexpandable* two-berth facility. Moreover, the rationale for the proposal that a nonexpandable two-berth facility be subjected to detailed "reasonable alternatives" analysis was that *Mack Point* might offer a more suitable alternative site for a *nonexpandable* two-berth facility than Sears Island. The court's attention has not been invited

---

13. When asked to clarify its contentions, the commentator indicated
> that it had "no conventional findings of fact to set forth" and that it had not "chosen to

search the record and respond to this proceeding by submitting citations of matter which we believe were proved or disproved." 435 U.S. at 554, 98 S.Ct. at 1217.

to any timely commentary which fairly alerted the FHwA to the need to treat a *partially expandable* terminal facility on Sears Island as a proposal requiring detailed "reasonable alternatives" analysis.

### b. Reasonableness of "Partially Expandable Terminal" Alternative

■ The defendants insist that NEPA does not necessitate *separate* EIS analysis of a partially expandable terminal facility, which the defendants regard merely as an intermediate step in the development of a fully expandable terminal, rather than as a proposed alternative. The defendants point out that the terminal facility proposed by MDOT, evaluated in the EIS, approved for funding by the FHwA, and permitted by the Corps, calls for the immediate construction of a modern two-berth marine dry cargo terminal. However, since terminal expansion capability is an integral feature of an economically viable port project, the preferred alternative is a two-berth termi-

nal facility capable of expansion to six berths. The defendants argue that nothing in NEPA, its regulations, or relevant judicial decisions, requires a detailed "reasonable alternatives" analysis of each intermediate stage in the development of the proposed project, so long as the EIS analyzes the impacts of the project at *full build-out* and the facility *design* is the same at initial build-out and full build-out.[14]

NEPA is an environmental full disclosure law, "designed to influence the decisionmaking process, [whose] aim is to make government officials notice environmental considerations and take them into account." *Sierra Club III*, 872 F.2d at 500. Its requirement of an EIS for all proposed actions significantly affecting the quality of the environment, 42 U.S.C. § 4332, is the primary legislative mandate for full environmental disclosure. Accordingly, the EIS must evaluate all connected actions,[15] cumulative actions,[16] cumulative impacts,[17] and reasonable alternatives,[18] *see* 40 C.F.R.

---

**14.** Robert E. Hunter, project manager for the Sears Island project, states:

> The main components of the two berth pier are the marginal wharf and the fill area behind it. Those components are integral to the construction of a functional two berth pier and are not the result of any consideration of the possible need in the future to expand the berthing facilities.
>
> If the port facility had been designed only as a two berth facility with *no* intention to provide for later expansion, the two berth design would have been the same as that currently proposed. No components would have been added or eliminated in such a case.
>
> If the port facility had been designed for expansion to 3, 4 or 5 berths, rather than 6 berths, the initial two berth phase which is the subject of this litigation would have been designed in the same manner as that presently proposed. Again, no components would have been added or eliminated because of differences in the intended level of expansion.
>
> Simply stated, the design for the two berth facility would remain the same regardless whether no expansion is contemplated or whether any one of the above-mentioned alternatives for full build-out is chosen.

Hunter Supp. Aff. at ¶¶ 6–9.

**15.** "Connected actions" must be discussed in the same impact statement.

> Actions are connected if they:
> (i) Automatically trigger other actions which may require environmental impact statements.

> (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.
> (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

40 C.F.R. § 1508.25(a)(1).

**16.** "Cumulative actions" are those "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).

**17.** A "cumulative impact" is an environmental impact

> which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

**18.** The scope of the EIS discussion of alternatives is defined by the "reasonableness" of the options, not by whether the applicant prefers or is capable of implementing a particular alternative. *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed.Reg. 18026, 18027 (1981) [*CEQ Forty Questions*]. Reasonable alternatives are those "that are *practical or feasible* from the

§ 1502.25, to assure that decisionmakers, as well as the public, are aware of the environmental impacts of the entire project, as *an interconnected whole*, so as to avoid irreversible commitment to an entire project on the strength of a segmented analysis of the impacts associated with something less than the entire project.

Similarly, the "reasonable alternatives" analysis is designed to provide decisionmakers and the public with a project "benchmark," *CEQ Forty Questions*, at 18027, against which the environmental costs and economic benefits of the project may be measured and less environmentally expensive alternatives to the proposed action may be identified. *See generally Sagebrush Rebellion v. Hodel*, 790 F.2d 760, 768 (discussion of alternatives is "central to NEPA's goal of promoting environmentally sound decisionmaking...."); *Residents in Protest–I–35E v. Dole*, 583 F.Supp. 653, 660 (D.Minn.1984) ("[A] reasonable alternative is one which serves the underlying goals of a project."); 40 C.F.R. § 1502.14 (The alternatives section "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public.")

The Sears Island FEIS states that the "proposed action involves the construction of a new marine dry cargo terminal with both rail and highway access on Sears Island, Searsport, Maine.... Under initial development, the preferred design will include a 27 acre marginal wharf with 2 ship berths, with the potential for future expansion to 35 acres and 6 berths." FEIS, Vol. I, at title page (unnumbered). The FHwA and Corps records of decision reveal that the Sears Island project consistently has been viewed by agency decisionmakers as a two-berth facility having certain characteristics, including in particular the capability of expansion to accommodate future cargo volume. *See* FHwA Record of Decision, at 1 [FHwA ROD], FHwA Record, Vol. III, at

40 (describing project as marine dry cargo terminal, with initial development at two berths and potential of 6); Corps ROD, at 1, Corps Record, Vol. III, at 58 (same); Corps Record, *id.* at 75 (Corps permit authorizes construction of only two berths). *Sierra Club IV* rejected any intimation that the essential elements of the proposed action were contrived to exclude Mack Point as a reasonable alternative site. *See Sierra Club IV*, 714 F.Supp. at 581 ("[I]t would appear sound business practice to design and locate a modern terminal with a view to its capacity to accommodate supportably-anticipated cargo types and volume *throughout* the useful life of the facility.")

The expansion capability of the Sears Island terminal facility is analogous, as concerns its integral relationship to the proposed project, to the expansion capability considered in *Greene County Planning Board v. Federal Power Commission*, 559 F.2d 1227 (2d Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1977), where the applicant proposed to construct a 345 kilovolt [kv] transmission line. The Federal Power Commission authorized a 345 kv line, capable of expansion to two 345 kv lines, or one 765 kv line, to accommodate future demand. Notwithstanding the fact that the EIS contained no detailed analysis of the special environmental effects of a 745 kv transmission, the Second Circuit upheld the FPC action on the grounds (1) that future expansion capability represented a "relatively minor modification of the primary structure," which did not compel future upgrading, and (2) that, before there could be any expansion, its environmental effects would be subject to further evaluation. *Id.* at 1331–32.

The MDOT proposes a baseline terminal facility consisting of two berths with a capability of expansion to six berths. *See, e.g.*, FEIS, Vol. I, at title page (unnumbered). "The design for the two berth facility would remain the same whether no

technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant." *Id.* The CEQ's interpretation of NEPA is entitled to "sub-

stantial deference." *See Sierra Club*, 701 F.Supp. at 915 n. 10. *Accord Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989).

expansion is contemplated or whether any one of the ... alternatives for full build-out is chosen." Hunter Supp. Aff. at ¶¶ 6–9, note 14 *supra*. Moreover, inasmuch as the challenged Corps permit authorizes construction of only two berths, the future construction of additional berths, whether one or four, would require recourse to the permit application process and its attendant NEPA procedures.[19] Finally, the FEIS avoids the environmental risks of a segmented impact analysis, by identifying at the outset the environmental impacts of the project at "full build-out."

The design of the two-berth baseline terminal facility would not be affected by a decision to restrict the project to a partially expandable pier facility. The environmental impacts of a fully expandable pier facility would be greater than those associated with a partially expandable facility. Further environmental impact analysis would be required at each successive stage in the build-out of the project. *See* note 19 *supra*. In view of these facts, which are disclosed in the administrative record, it is clear that agency decisionmakers and the public were presented, from the outset, with an analysis of the likely environmental impacts of the proposed action adequate to enable an informed comparison with proposed alternatives.

The plaintiffs have not established, by a preponderance of the evidence, *see Druid*

*Hills Civic Ass'n v. Federal Highway Administration*, 772 F.2d 700, 709 n. 9 (11th Cir.1985), that the "reasonable alternatives" analysis was arbitrary and capricious.

### 3. *Supplemental EIS*

In *Sierra Club IV*, the court ruled that the plaintiffs were likely to succeed on the merits of their claim that the Corps and the FHwA violated NEPA regulations by not preparing a supplemental EIS evaluating the environmental impacts portended by certain revised estimates of the onshore acreage requirements of the proposed cargo terminal facility.[20] 714 F.Supp. at 571, 572. Central to that ruling was the apparent failure of either agency to *consider* whether the increased acreage requirements "significantly" would affect the FEIS analysis of the environmental impacts of the project. *See id.* at 569–572.

The defendants now propose to retain a consultant to compile a supplemental information report (SIR) which the agencies would use to determine whether the increased acreage requirements of the terminal project warrant preparation of a supplemental EIS. The defendants propose that the court delay ruling on the merits of the claim pending completion of the SIR. The plaintiffs insist that preparation of a supplemental EIS is required by NEPA.

---

**19.** The construction of additional berths would necessitate additional dredging for which a Corps permit would be required. *See* FEIS, Vol. I, at 4–44 (future development would require dredging an additional 880,000 cubic yards); 33 U.S.C. § 1344 (Corps permit need for release of dredged material into waterway). Corps permits issued under the CWA are deemed major federal actions subject to NEPA. *Quinonez–Lopez v. Coco Lagoon Development Corp.*, 733 F.2d 1, 2 (1st Cir.1984). Under NEPA regulations, before issuing a permit the Corps is required to prepare an EA to determine if preparation of an EIS is warranted. *See* 40 C.F.R. § 1501.3(a). Additionally, CWA regulations require that environmental impacts be considered during the public interest review conducted for all CWA § 404 permits. *See* 33 C.F.R. § 320.4(a).

**20.** The FEIS states that the terminal facility "will be built on approximately 50 acres along the western shore" of Sears Island. FEIS Vol. I, at ii. *See also id.* at 2–10, 4–3, A–39.

The "50 acre" figure was predicated on the assumption that a six-berth terminal would be constructed. *See* FEIS Vol. I, at 4–3 ("full development of the cargo terminal would eliminate approximately 40 acres of wildlife habitat"); *id.* at 4–4 (construction of causeway and access road would affect 6.9 acres of wildlife habitat). Between the time the FHwA approved the FEIS and the time the Corps permit was issued, MDOT's consultants increased their estimate of the acreage requirements of the ship loading and unloading facilities, at full buildout (six berths), to 124 acres, in response to inquiries from the Corps. *See* Answers to Corps Twenty Questions, Corps Record, Vol. II, at 27. The revised estimates for a two-berth and a four-berth terminal are 68 and 100 acres, respectively. *Id.*
*Sierra Club IV*, 714 F.Supp. at 566 (footnote omitted).

NEPA itself does not discuss the preparation of a "supplemental" EIS, as such.[21] *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 109 S.Ct. 1851, 1857, 104 L.Ed.2d 377 (1989). However, "[p]reparation of such statements ... is at times necessary to satisfy the Act's 'action-forcing' purpose." *Id.* 109 S.Ct. at 1857–58 (footnote omitted). Accordingly, the CEQ has developed regulations requiring a supplemental EIS, if

(i) [t]he agency makes *substantial changes* in the proposed action that are relevant to environmental concerns; *or*

(ii) [t]here are significant new circumstances or *information relevant to environmental concerns* and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1) (emphasis added).[22]

In *Sierra Club IV* the court found that the failure to prepare a supplemental EIS was "arbitrary and capricious," because the FHwA and the Corps had not "careful-ly evaluated the environmental significance of the revised acreage estimates...." 714 F.Supp. at 572. The court ruled that the agency decisions could not be allowed to stand because neither the FHwA nor the Corps had satisfied its "duty to take a hard look at the proffered new [information]." [23] *Id.* at 572 (quoting *Oregon Natural Resources Council*, 109 S.Ct. at 1865). The court accordingly enjoined the project pending agency compliance with "the NEPA requirement that all new information be assessed with a view to determining whether its environmental significance requires preparation of a supplemental EIS." Order Amending Preliminary Injunction, at 2.

Plaintiffs now appear to argue that the FHwA and the Corps must prepare a supplemental EIS without regard to any preliminary agency assessment of the environmental significance of the revised acreage requirements. Plaintiffs contend that the governing CEQ regulation mandates a supplemental EIS once it has been determined

---

**21.** NEPA provides in pertinent part:

The Congress authorizes and directs that, to the fullest extent possible ... (2) all agencies of the Federal Government shall—

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332.

**22.** The FHwA and the Corps have promulgated regulations governing the preparation of supplemental environmental impact statements.

The FHwA regulation provides:

Supplements will be necessary when there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures. However, a supplemental EIS will not be necessary if the Administration decides to fund an alternative adequately covered in the Final EIS but not identified as the proposed action. The decision to prepare a supplement to the FEIS shall not require withdrawal of the previous approvals for those aspects of the proposed action not directly affected by the changed condition or new information. A supplement is to be developed in the same manner (except that scoping is not required) as a new EIS (draft and final, with a ROD).

23 C.F.R. § 771.129(b).

The Corps regulation states:

A supplement to the draft or final EIS on file will be prepared whenever significant impacts resulting from changes in the proposed plan or new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action as discussed in 40 CFR 1502.9(c).

33 C.F.R. § 230.11(b).

**23.** The court found the new information "potentially significant."

Although there is no *direct* record evidence that any environmental effects attributable to the larger complex would differ in a *qualitative* sense from the impacts considered in the FEIS, at some point the cumulative environmental effects of enlarging the scale of a project may effect qualitative environmental change both inside and outside the project area, particularly the aural and visual effects of an enlarged facility.

*Sierra Club IV*, 714 F.Supp. at 569.

that the proposed action has "substantially change[d]," 40 C.F.R. § 1502.9(c), in a manner "relevant to environmental concerns." Plaintiffs further argue that an increase in the acreage requirements from 70 + "onshore" acres to 124 "onshore" acres represents a "substantial change" in the proposal to construct a marine cargo terminal and that the impact on wildlife habitat makes the change environmentally relevant.[24]

■ The cases are clear that an agency need not prepare a supplemental EIS in response to every piece of new information, or every change in circumstance, which comes to light following the approval of the FEIS. *See Sierra Club v. Froehlke,* 816 F.2d 205, 210 (5th Cir.1987) (discussing need for supplemental EIS due to *new information*); *Vine Street Concerned Citizens, Inc. v. Dole,* 630 F.Supp. 24, 27 (E.D. Pa.1985) (discussing need for supplemental EIS in *new circumstances*). For a supplemental EIS to be required, "new circumstances must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Froehlke,* 816 F.2d at 210 (emphasis in original) (citing *Wisconsin v. Weinberger,* 745 F.2d 412, 471 (7th Cir. 1984)). The court is not aware of any sound reason for applying a different standard for determining the need for a supplemental EIS in response to "substantial changes in the proposed actions," *see* 40 C.F.R. § 1502.9(c)(1)(ii), than in response to "significant new circumstances or information," *id.* at (ii).

> NEPA is an environmental full disclosure law, and the decision to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: if there remains "major Federal actio[n]" to occur, and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Oregon Natural Resources Council,* 109 S.Ct. at 1859 (quoting 42 U.S.C. § 4332(c)). The plaintiffs argue that a supplemental EIS must be prepared once the court determines that the agency decision not to do so was "arbitrary and capricious." Relying on *Essex County Preservation Association v. Campbell,* 536 F.2d 956 (1st Cir. 1976), and *Watt,* 716 F.2d 946 (1st Cir. 1983), plaintiffs contend that preparation of a supplemental EIS for public review and comment is essential to protect against agency bias.

In *Essex County,* where it appeared that there was "significant new information ... concerning [the] action's environmental aspects," the First Circuit decided that it could not "say it was improper for the district court to prepare and circulate a supplemental EIS directed to the impact of [the new information]." 536 F.2d at 961. Similarly, in *Watt* the court assumed that the new information was environmentally significant and determined that a supplemental EIS was necessary. *See Watt,* 716 F.2d at 950–951 (the environmental significance of the new information, its probable accuracy, the degree of care with which the agency considered the information, evaluated it and supported the decision not to supplement, "cut in favor of requiring a supplement").

SIRs are accepted vehicles for evaluating whether the environmental significance of new information warrants a supplemental EIS. *See Louisiana Wildlife Federation v. York,* 761 F.2d 1044, 1051 (5th Cir.1985) (initial responsibility for determining environmental significance of new information rests with agency; court remands to agency for that purpose). A SIR would seem appropriate in these circumstances, provided that the preliminary injunction remains in place. The plaintiffs may challenge the SIR upon its completion, as well as any agency decision not to prepare a supplemental EIS. *See Oregon Natural Resources Council,* 109 S.Ct. at 1861 (upholding decision, based on SIR prepared during

---

**24.** The FEIS indicates that construction and operation of the terminal is expected to cause a complete loss of wildlife habitat and carrying capacity on each acre utilized. *See* FEIS, Vol. I, at 2–20. *See also Sierra Club IV,* 714 F.Supp. at 568.

course of litigation, not to prepare supplemental EIS).

Accordingly, the court defers a determination on the merits of the NEPA claim predicated on the failure to prepare a supplemental EIS.

### III. CONCLUSION

For the stated reasons, Defendants' Motions For Summary Judgment are *granted* as to paragraphs 41(a), (b), (c), (d), (e), (f), (g) and 43(a), (b) and (d) of Plaintiffs' Amended Complaint; and the Amended Preliminary Injunction of June 1, 1989 is amended to read:

I. The plaintiffs are likely to succeed on the merits of their NEPA claim that significant new information relating to the increased acreage requirements of a six-berth cargo terminal facility on Sears Island necessitates the preparation of a supplemental EIS.

II. Irreparable harm is likely to occur in the absence of a preliminary injunction.

. . . .

IV. The public interest is better served by preliminary injunctive relief ensuring maintenance of the *status quo* pending preparation of a SIR and further order of the court.

The state and federal defendants, their employees, representatives, agents, and all persons acting under or in concert with them, are hereby restrained and enjoined from permitting, commencing, or continuing, any causeway, roadway, building, pier cell or other improvement relating to the development of a marine cargo terminal and industrial park on Sears Island, pending either further order of this court or compliance by the FHwA and the Corps with the NEPA requirement that all new information be assessed with a view to determining whether its environmental significance requires preparation of a supplemental EIS.

SO ORDERED.