USCA1 Opinion

 

 September 30, 1992 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1312 SIERRA CLUB AND WILLIAM O'NEIL, Plaintiffs, Appellants, v. JOHN O. MARSH, JR., ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MAINE [Hon. Morton A. Brody, U.S. District Judge] ___________________ ____________________ Before Torruella and Boudin, Circuit Judges, ______________ and Keeton,* District Judge. ______________ ____________________ Edward F. Lawson with whom Weston, Patrick, Willard & Redding was ________________ ___________________________________ on brief for appellants. Anthony C. Roth with whom John Quarles, Morgan, Lewis & Bockius, _______________ _____________ ________________________ and Thomas G. Reeves, Chief Counsel, Legal Division, Maine Department ________________ of Transportation, were on joint brief of appellees, for appellee Maine Department of Transportation. David C. Shilton, Attorney, Environment and Natural Resources __________________ Division, U.S. Department of Justice, with whom Barry M. Hartman, _________________ Acting Assistant Attorney General, and Robert L. Klarquist, Attorney, ___________________ Environment and Natural Resources Division, U.S. Department of Justice, were on joint brief of appellees, for federal appellees. ____________________ ____________________ _____________________ * Of the District of Massachusetts, sitting by designation. 2 KEETON, District Judge. Sierra Club and two of _______________ its members ("Sierra Club"), challenging the adequacy of an Environmental Impact Statement ("EIS"), appeal from a summary judgment entered by the United States District Court for the District of Maine in favor of appellees Maine Department of Transportation, Federal Highway Administration, Army Corps of Engineers, and United States Coast Guard ("agencies") on Sierra Club's National Environmental Policy Act ("NEPA") claims arising out of a port project in Searsport, Maine. Although it appears that the Federal Highway Administration is ultimately responsible for the preparation of the final EIS, see Sierra Club v. ___ ___________ Marsh, 701 F. Supp. 886, 916-18 (D. Me. 1988) and _____ Supplemental Affidavit of William Richardson at 1, all of the defendant agencies were involved in the preparation of the EIS. As a matter of convenience, we will refer to the "agencies" when discussing the EIS. Sierra Club challenges the district court's conclusion that the analysis of secondary impacts in the agencies' final EIS satisfies NEPA. We affirm. I. I. Background Background More than ten years ago, Maine Department of Transportation decided to build a modern port facility on Sears Island in Searsport, Maine. The port project includes construction of a marine dry cargo terminal and the building of a causeway and highways to provide full rail and road access to the port facility. A more detailed description of the project appears in Sierra Club v. Marsh, 769 F.2d 868, ___________ _____ 872-73 (1st Cir. 1985). In three separate cases filed in the United States District Court for the District of Maine, Sierra Club has initiated several legal challenges to the construction of the port facility. Rulings of the district court in the first two cases have been the subject of three appeals to this court. See Sierra Club v. Marsh, 769 F.2d 868 (1st ___ ____________ _____ Cir. 1985) ("Sierra Club I") (holding that NEPA requires the _____________ federal agencies to prepare an EIS); Sierra Club v. ____________ Secretary of Transp., 779 F.2d 776 (1st Cir. 1985) ("Sierra ____________________ ______ Club II") (affirming the district court's decision that the _______ Coast Guard had unlawfully issued a permit for the proposed causeway under the General Bridge Act); Sierra Club v. ___________ Secretary of the Army, 820 F.2d 513 (1st Cir. 1987) ("Sierra _____________________ ______ Club III")(affirming the district court's award of _________ attorney's fees to Sierra Club). The present appeal is from a final judgment in the third case, which was commenced by a complaint filed on May -4- 4 19, 1988. In this complaint Sierra Club requests declaratory and injunctive relief halting construction of the marine dry cargo terminal on Sears Island. The complaint alleges that construction permits issued by the federal agency defendants must be suspended due to failure to comply with the Clean Water Act, 33 U.S.C. 1344, section 9 of the Rivers and Harbors Act, 33 U.S.C. 401, and NEPA, 42 U.S.C. 4331, et seq. __ ___ Some of the issues raised in the complaint have been dispositively resolved and are not before us. In particular, the district court entered two separate final judgments for the agencies -- on the Clean Water Act claims on January 30, 1990 and on the Harbor Act claims on March 29, 1991 -- from which Sierra Club did not appeal. These claims are not at issue in this appeal. The procedural history that follows, therefore, is concerned only with the issues that Sierra Club seeks to pursue on this appeal. Sierra Club moved for a preliminary injunction on August 12, 1988. The district court denied Sierra Club's motion on the ground that Sierra Club had failed to establish that it would be irreparably harmed if an injunction was not issued. See Sierra Club v. Marsh, 701 F. ___ ___________ _____ Supp. 886 (D. Me. 1988) ("Sierra Club IV-A"). On appeal, ________________ -5- 5 this court vacated the district court's decision and remanded. See Sierra Club v. Marsh, 872 F.2d 497 (1st Cir. ___ ___________ _____ 1989) ("Sierra Club IV-B"). Upon remand, the district court ________________ (Cyr, J.) reconsidered the issue of irreparable harm and issued a preliminary injunction. See Sierra Club v. Marsh, ___ ___________ _____ 714 F. Supp. 539 (D. Me. 1989) ("Sierra Club IV-C"). The _________________ district court concluded that Sierra Club had shown a likelihood of success on the merits of its NEPA claims, and in particular on its claim that the EIS discussion of the port project's secondary impacts was inadequate. See id. at ___ ___ 564. Approximately two months after entering the preliminary injunction, the district court allowed, over opposition by Sierra Club, a defense motion for leave to make a supplemental filing. The agencies filed four affidavits to explain the administrative record, and all parties filed additional memoranda. After reviewing the administrative record, affidavits, and additional memoranda from the parties, the district court (Cyr, J.) granted summary judgment for the agencies on Sierra Club's NEPA secondary impacts claim and denied Sierra Club's cross-motion for summary judgment. See ___ Sierra Club v. Marsh, 744 F. Supp. 352 (D. Me. 1989) ____________ _____ -6- 6 ("Sierra Club IV-D"). The court concluded, inter alia, that ________________ __________ the final EIS analysis of secondary impacts satisfies NEPA. See id. at 359-60. ___ ___ Sierra Club appealed immediately from the summary judgment order. This court concluded that the district court's decision on summary judgment was interlocutory rather than final, that it had not amended the preliminary injunction within the meaning of 28 U.S.C. 1292(a)(1), and that no appealable order had been entered. It dismissed the appeal for want of jurisdiction. See Sierra Club v. Marsh, ___ ___________ _____ 907 F.2d 210 (1st Cir. 1990) ("Sierra Club IV-E"). ______ _________ By Order of January 23, 1992, as amended February 12, 1992, the district court (Brody, J.) entered final judgment for the agencies, incorporating, inter alia, the _____ ____ earlier summary judgment for the agencies on Sierra Club's NEPA secondary impact claim. This appeal followed. In Sierra Club IV-C, the district court concluded ________________ also that Sierra Club had demonstrated a likelihood of success on the merits of its claim that the agencies violated NEPA by not preparing a supplemental EIS to evaluate new information on the acreage of the project. See ___ Sierra Club IV-C, 714 F. Supp. at 565-72. In its Memorandum ________________ on the parties' cross-motions for summary judgment, the -7- 7 district court again concluded that Sierra Club had demonstrated a likelihood of success on its supplemental EIS claim, but the court deferred making a judgment on the merits in light of the agencies' proposal to retain a consultant to study whether the increased acreage requirements of the project warrant the preparation of a supplemental EIS. See Sierra Club IV-D, 744 F. Supp. at ___ _________________ 365-68. As a result of further consideration by the agencies, agency announcements were made on July 15 and July 25, 1991, that a supplemental EIS was to be prepared. Accordingly, in its Final Judgment of January 23, 1992, as amended February 12, 1992, the district court dismissed Sierra Club's supplemental EIS claim as moot. Thus, our affirmance may not bring an end to litigation over the Searsport project as Sierra Club may challenge the adequacy of the supplemental EIS. This matter, however, has no effect on the present appeal. II. II. Legal Requirements Regarding EIS Legal Requirements Regarding EIS Secondary Impacts Analysis Secondary Impacts Analysis NEPA requires federal agencies to prepare "a detailed statement . . . on the environmental impact" of any proposed federal project "significantly affecting the quality of the human environment." 42 U.S.C. -8- 8 4332(2)(C)(i). Not all impacts need be discussed in exhaustive detail. First, only those effects that are "likely" (or "foreseeable" or "reasonably foreseeable") need be discussed, see Sierra Club I, 769 F.2d at 875, and, as in ___ _____________ other legal contexts, the terms "likely" and "foreseeable," as applied to a type of environmental impact, are properly interpreted as meaning that the impact is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision. Cf. Barber ___ ______ Lines A/S v. M/V Donau Maru, 764 F.2d 50 (1st Cir. 1985) _________ _______________ (explaining the meaning of "likely" and "foreseeable" as applied to tort liability for "financial losses" not associated with physical harm). Thus, "duty" to discuss in the EIS particular ones among all the types of potential impacts is not an "absolute" or "strict" duty but one measured by an objective standard. That is, a likelihood of occurrence, which gives rise to the duty, is determined from the perspective of the person of ordinary prudence in the position of the decisionmaker at the time the decision is made about what to include in the EIS. Second, even as to those effects sufficiently likely to occur to merit inclusion, the EIS need only "furnish such information as appears to be reasonably necessary under the circumstances -9- 9 for evaluation of the project." Britt v. United States Army _____ __________________ Corps of Engineers, 769 F.2d 84, 91 (2d Cir. 1985); accord __________________ ______ Concerned Citizens on I-90 v. Secretary of Transp., 641 F.2d __________________________ ____________________ 1, 5 (1st Cir. 1981) (stating that the issue is whether the "'EIS can be said to constitute a statement which enable[d] those who did not have a part in its compilation to understand and consider meaningfully the factors involved'") (quoting Cummington Preservation Comm. v. Federal Aviation _____________________________ ________________ Admin., 524 F.2d 241, 244 (1st Cir. 1975)). ______ In the interest of clarity, we elaborate immediately below on the first of these two points and on its applicability to this case. More on the second point appears in Part V, infra. _____ The federal Council on Environmental Quality has issued regulations that inform federal agencies of what must be included in the EIS. See 40 C.F.R. 1500, et seq. ___ __ ____ (1991); Sierra Club I, 769 F.2d at 870. These regulations _____________ mandate that the EIS discuss the direct and indirect effects (secondary impacts) of a proposed project. See 40 C.F.R. ___ 1502.16. Indirect effects (or secondary impacts) are those effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may -10- 10 include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems. 40 C.F.R. 1508.8. Agencies must consider only those indirect effects that are "reasonably foreseeable." They need not consider potential effects that are highly speculative or indefinite. See Kleppe v. Sierra Club, 427 U.S. 390, 402 (1976); Sierra ___ ______ ___________ ______ Club I, 769 F.2d at 878. As this court has explained: ______ Whether a particular set of impacts is definite enough to take into account, or too speculative to warrant consideration, reflects several different factors. With what confidence can one say that the impacts are likely to occur? Can one describe them 'now' with sufficient specificity to make their consideration useful? If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision? Sierra Club I, 769 F.2d at 878 (citing Massachusetts v. ______________ _____________ Watt, 716 F.2d 946, 952-53 (1st Cir. 1983)). ____ III. III. The Challenged EIS Analysis of Secondary Impacts The Challenged EIS Analysis of Secondary Impacts -11- 11 The EIS at issue in this case defines secondary impacts as "impacts induced by and attributable to the [cargo] terminal and its operation." Final EIS, Vol. I, 4- 108 (Appendix ("App.") 117). The EIS analysis of secondary impacts devotes 47 pages to a discussion of a proposed industrial park on Sears Island. See Sierra Club IV-A, 701 F. Supp. at 918. The ___ ________________ discussion assumes that the industry types likely to develop in the proposed park are (1) fabricated metal products; (2) non-electrical machinery and equipment; (3) electrical and electronic machinery and equipment; and (4) transportation equipment. See id. This type of industry is known as ___ ___ "light-dry." The EIS does not discuss the development of any other type of industry as an indirect effect of the port project. In its Memorandum on Sierra Club's motion for a preliminary injunction, the district court determined that the agencies' decision to include the four light-dry industries in the EIS evaluation of secondary impacts was reasonable. See Sierra Club IV-C, 714 F. Supp. at 564. The ___ ________________ court concluded also, however, that the information before the agencies suggested that it was reasonably foreseeable that heavy industry, as well as food processing and forest -12- 12 product industries, were likely to develop on Sears Island as a result of the port project. The district court concluded that it was unable to determine whether the agencies' decision not to include these industries in the EIS discussion of secondary impacts was reasonable because there is nothing in the record, except ipse dixit, to demonstrate an actual ____ _____ __ ______ agency decision to restrict the ______ ________ secondary impact analysis to these four types of potential industrial development, much less the rationale for such a decision. Id. The court added that ___ judicial review is rendered utterly infeasible where the administrative ______________ record fails even to disclose whether ______ information seemingly relevant to a rational secondary impact analysis was ever considered by the agency or, if so, how it was considered. Id. at 565 (emphasis added). Accordingly, the court ___ concluded that Sierra Club had exhibited a likelihood of success on the merits of its claim that the EIS analysis of secondary impacts was inadequate and entered a preliminary injunction. In the filings submitted after the preliminary injunction was issued, the agencies offered four affidavits to supplement and explain the administrative record. See ___ Supplemental Affidavit of Francis Mahady ("Mahady -13- 13 Supplemental Affidavit"); Supplemental Affidavit of William Richardson ("Richardson Supplemental Affidavit"); Supplemental Affidavit of Robert Hunter; Affidavit of Leslie Stevens. Sierra Club moved to strike the affidavits. The district court, citing Camp v. Pitts, 411 U.S. 138, 142 ____ _____ (1973)(per curiam), concluded that the affidavits could properly be and were received by the court to explain apparent gaps in, and otherwise to clarify, the administrative record. See Sierra Club IV-D, 744 F. Supp. ___ ________________ at 356 n.7. After reviewing the affidavits, the court ruled that the supplemental affidavits remedied the deficiencies in the administrative record because they demonstrated that there was an actual agency decision to restrict the secondary impact analysis to light-dry industries and they explained the rationale for that decision. See id. at 359 & ___ ___ n.11. The court concluded further that the basis for the agencies' decision was rational and supported by credible evidence. See id. at 359. ___ ___ In the present appeal, following further proceedings and the entry of Final Judgment, Sierra Club contends (1) that the district court erred in admitting and considering the agencies' supplemental affidavits to determine whether the EIS discussion of secondary impacts is -14- 14 adequate and (2) that the district court erred in concluding that the final EIS adequately considers the secondary impacts of the port project. IV. IV. Standards of Review Standards of Review Judicial review of an agency's compliance with NEPA is governed by section 10 of the Administrative Procedure Act, 5 U.S.C. 701, et seq. See Marsh v. Oregon __ ___ ___ _____ ______ Natural Resources Council, 490 U.S. 360, 375 (1989). A __________________________ reviewing court must hold unlawful any agency action, findings and conclusions that are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . .'" Conservation Law Foundation, Inc. v. Secretary of the ____________________________________ __________________ Interior, 864 F.2d 954, 957 (1st Cir. 1989) (quoting 5 ________ U.S.C. 706(2)(A)); accord Sierra Club I, 769 F.2d at 870; ______ _____________ Concerned Citizens, 641 F.2d at 3; Silva v. Lynn, 482 F.2d __________________ _____ ____ 1282, 1283 (1st Cir. 1973). This standard of review is highly deferential; the court must presume the agency action to be valid. See Citizens To Preserve Overton Park, Inc. v. ___ _______________________________________ Volpe, 401 U.S 402, 415 (1971); Conservation Law Foundation, _____ ____________________________ Inc., 864 F.2d at 957-58. The reviewing court should not ____ defer to the agency, however, "without carefully reviewing the record and satisfying [itself] that the agency has made -15- 15 a reasoned decision based on its evaluation" of the available information. Oregon Natural Resources Council, _________________________________ 490 U.S. at 378; see also Grazing Fields Farm v. ___ ____ ______________________ Goldschmidt, 626 F.2d 1068, 1072 (1st Cir. 1980) ("The court ___________ should only assure itself that the agency has given good faith consideration to the environmental consequences of its actions"). That is, the court must "look to see if the ____________________ agency decision, in the context of the record, is too ________________ ______ 'unreasonable' (given its statutory and factual context) for ______________ ___ the law to permit it to stand." Sierra Club I, 769 F.2d at ______________________________ _____________ 871 (emphasis added). The district court, applying this standard of review, concluded that the agencies' decision to restrict the EIS secondary impacts analysis to light-dry industries was rational and supportable on the record. See Sierra Club ___ ___________ IV-D, 744 F. Supp. at 359. ____ In Sierra Club I, we stated that we will take a _____________ practical approach to deciding what standard of review to apply to our review of a district court's review of an agency decision. We should be more willing, or be less willing, to differ with a district court about the 'reasonableness' or 'arbitrariness' of any agency decision, depending on the particular features of the particular case that seem to make a -16- 16 more independent, or less independent, appellate court scrutiny of the administrative record appropriate. Sierra Club I, 769 F.2d at 871-72. We should show proper _____________ hesitation to overturn a district court's judgment as to the reasonableness of an agency decision where, for example, the "court's judgment turns on matters of fact that it has __ determined, or upon evidence presented by witnesses in court, or even upon lengthy district court proceedings in which knowledgeable counsel explain the agency's decision- making process in detail." Id. at 872. Where, however, we ___ are to apply the same legal standard to the agency decision as did the district court and where the district court made no findings of fact and heard no witnesses we will "exercise a considerable degree of independence in reviewing the administrative record" to determine whether the district court's decision is correct. Id. ___ The agencies argue, unsurprisingly, that the circumstances of this case at this point in the litigation require us to apply the "hesitate-to-overturn" standard in our review of the district court's decision. Sierra Club, also unsurprisingly, contends that the circumstances of this case mandate that we apply the "considerable-degree-of- independence" standard. We need not resolve this dispute. -17- 17 We conclude that even if we apply the less deferential "considerable-degree-of-independence" standard, the district court's decision must be affirmed. V. V. The Affidavits The Affidavits Sierra Club argues that the district court erred in admitting and considering the agencies' supplemental affidavits to -18- 18 determine the adequacy of the EIS evaluation of secondary impacts. A. A. As stated in Part II, supra, NEPA requires an _____ agency to prepare a "detailed statement" discussing, inter _____ alia, the indirect effects of a proposed project. See 40 ____ ___ C.F.R. 1502.16. This requirement serves many purposes. "The detailed statement aids a reviewing court to ascertain whether the agency has given [ ] good faith consideration to environmental concerns . . . , provides environmental information to the public and interested departments of government, and prevents stubborn problems or significant criticism from being shielded from internal and external scrutiny." Grazing Fields Farm, 626 F.2d at 1072 (citing ___________________ Silva, 482 F.2d at 1284-85). _____ Because public disclosure is a central purpose of NEPA, an EIS that does not include all that is required by NEPA may not be cured by memoranda or reports that are included in the administrative record but are not incorporated into the EIS itself. See id. at 1073; see also ___ ___ ___ ____ Watt, 716 F.2d at 951 ("unless a document has been publicly ____ circulated and available for public comment, it does not satisfy NEPA's EIS requirements"); National Resources ____________________ -19- 19 Defense Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C. _____________________ ______ Cir. 1972) (holding that the EIS "must set forth the material contemplated by Congress in form suitable for the enlightenment of the others concerned"); Appalachian ___________ Mountain Club v. Brinegar, 394 F. Supp. 105, 122 (D.N.H. _____________ ________ 1975) (holding that a deficient EIS cannot be resurrected by supplemental information not processed in the same manner as a draft EIS because it denies the public "the opportunity to test, assess, and evaluate the data and make an informed judgment as to the validity of the conclusions to be drawn therefrom"). Sierra Club argues that "[h]aving concluded on May 30, 1989, Sierra Club IV-C, 714 F. Supp. at 565, that the _________________ EIS did not properly explain why the secondary impacts analysis of the EIS considered only four light-dry industries, the District Court erred by allowing the use of affidavits to provide the missing explanation." Appellants' Brief at p. 29. Such an approach, the argument goes, violates NEPA by allowing an otherwise defective EIS to be cured by documentation not circulated to the public. Sierra Club's challenge fails for two reasons. First, the district court did not conclude that the EIS was inadequate because it (the EIS) did not explain -20- 20 how the agencies determined the scope of the EIS secondary impacts analysis. Instead, the court concluded that it could find nothing in the administrative record that ______________________ evidenced that the agencies had ever made a decision on what secondary impacts to include in the EIS, let alone any evidence of the rationale for that decision. See Part III, ___ supra; Sierra Club IV-C, 714 F. Supp. at 565. _____ ________________ Second, and more important, Sierra Club's contention suffers from a false premise. The implied premise of its position is that NEPA requires the EIS to _____________________ explain how the agencies determined the scope of the EIS -- _________________________________________________________ that, for example, NEPA requires the EIS to include a discussion of why the agency determined that certain indirect effects of a proposed project are not reasonably ___________________ foreseeable and therefore are not discussed in the EIS. It _______________________________________________________ is true that NEPA requires an EIS to analyze the environmental effects of what the agency decisionmakers determine to be the secondary industrial effects of a proposed project. In the statute and its concomitant regulations, however, there is nothing that requires an EIS to explain how an agency determined the scope of an EIS, including, for example, why it excluded from the EIS each alleged impact that the agencies determined did not in fact -21- 21 qualify as a secondary impact. See Piedmont Heights Civic ___ _______________________ Club, Inc. v. Moreland, 637 F.2d 430, 440 (5th Cir. 1981) ___________ ________ (holding that it (the court) could not find "any authority, requiring an EIS to explicitly discuss the factors that determine the scope of the EIS"). Our decision in Grazing Fields Farm illustrates ____________________ this distinction. NEPA requires an EIS to include an evaluation of alternatives to the proposed agency action. See 42 U.S.C. ___ 4332(2)(C)(iii). The plaintiff in Grazing Fields Farm ____________________ challenged the adequacy of an EIS prepared for a highway project on the ground that it did not adequately discuss a suggested alternative to the proposed route of the highway. After reviewing the administrative record, the district court concluded that the federal agency had carefully and thoroughly evaluated the alternative in compliance with NEPA, even though that evaluation and the information it was based upon was not included in the EIS. See Grazing Fields ___ ______________ Farm, 626 F.2d at 1071. This court reversed, holding that ____ an administrative record cannot satisfy NEPA's requirement for a detailed statement evaluating alternatives to a proposed project. See id. at 1072. The opinion cautioned, ___ ___ however, that "our holding does not mean that the -22- 22 administrative record should play no part in the evaluation of the adequacy of the discussion of alternatives in an [EIS]." Id. at 1074. ___ Study of the administrative record by the court helps to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decision-making process it is brought to the attention of the agency. . . . This use of the record to inform a court's judgment about the adequacy of an EIS must be distinguished from our holding today that agency consideration of alternatives evidenced by the record cannot replace the NEPA mandated discussion of alternatives in the [EIS] itself. In other words, the district court can use the administrative record to set the standard for how much discussion within the EIS a particular alternative merits, but cannot deem the unincorporated record to satisfy that standard. Id. (footnotes omitted); see also Valley Citizens For a Safe ___ ___ ____ __________________________ Env't v. Aldridge, 886 F.2d 458, 460 (1st Cir. 1989) _____ ________ (stating that in a NEPA case "[t]he relevant legal question . . . is normally whether the Statement is 'adequate' in light of the information and comments before the agency at the time it produced the Statement"). Another way of explaining when it is appropriate for a court to go beyond examining the EIS itself and review the administrative record in a NEPA case is to say that a -23- 23 reviewing court may not rely on information and analysis in an administrative record to cure an inadequate EIS, but it may, and indeed must, review the administrative record to determine whether the EIS is inadequate in the first place. See Sierra Club IV-D, 744 F. Supp. at 359 n.11. In ___ _________________ Conservation Law Foundation, Inc. v. Andrus, 617 F.2d 296 __________________________________ ______ (1st Cir. 1979), for example, the plaintiff claimed that an EIS did not adequately discuss an alternative to the proposed project. After reviewing information in the administrative record that revealed that the alternative was largely hypothetical, we concluded that the "pedestrian" analysis of the alternative in the EIS was adequate. See ___ id. at 299. "Thus, our examination of the administrative ___ record informed our judgment as to how extensively the proposed alternative had to be discussed within the EIS itself." Grazing Fields Farm, 626 F.2d at 1074 n.4 _____________________ (discussing Andrus). ______ In this case the district court similarly examined the administrative record, including the supplementary affidavits, to determine whether the EIS secondary impact analysis was adequate. After reviewing the record, the court concluded that it was reasonable for the agencies to conclude that the four light-dry industries evaluated in the -24- 24 EIS are the only industries that are reasonably likely to develop on Sears Island as a result of the port project. If, in contrast, the district court had concluded, for example, that it was unreasonable for the agencies to decide that heavy industry was not a reasonably foreseeable secondary impact of the port project, therefore making the EIS analysis of secondary impacts inadequate (because the EIS did not discuss all reasonably foreseeable indirect effects), that inadequacy could not be cured by information and analysis that is in the administrative record but not incorporated into the EIS. See Grazing Fields Farm, 626 ___ ____________________ F.2d at 1072. That is, the court could not look to evidence in the administrative record or in supplementary affidavits that suggested that the agencies had made an informed, good faith decision to go forward with the project after informing themselves of the environmental effects of heavy industry because that approach would defeat NEPA's goal of informing the public of the likely environmental consequences of the proposed project. B. B. Having determined that a reviewing court may turn to the administrative record to decide whether an agency's decision on the scope of an EIS is reasonable, we must -25- 25 address whether the district court erred in permitting supplementation of the administrative record by considering the agencies' affidavits submitted after entry of the preliminary injunction. The focal point for a court's review of an agency's decision is the administrative record. See, e.g., ___ ____ Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743 ____________________________ ______ (1985); Camp, 411 U.S. at 142; Valley Citizens For a Safe ____ ___________________________ Env't, 886 F.2d at 460. "The fact that review sometimes or _____ often focuses on the initial record does not mean that it must, or always, will do so." Valley Citizens For a Safe ___________________________ Env't, 886 F.2d at 460. _____ Where there was a failure to explain administrative action so as to frustrate effective judicial review, . . . the remedy is to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary. Camp, 411 U.S. at 143; see also Overton Park, 401 U.S. at ____ ___ ____ ____________ 420 (stating that where there are no formal findings, examining the decisionmakers themselves may be the only way there can be effective judicial review); Manhattan Tankers, __________________ Inc. v. Dole, 787 F.2d 667, 672 n.6 (D.C. Cir. 1986) ____ ____ (holding that the court "may properly uphold the Coast Guard's decision on the basis of affidavits or testimony by -26- 26 the administrator who made the decision concerning his reasoning at the time of the decision"). The administrative record may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature." Arkla Exploration Co. v. Texas Oil & _____________________ ___________ Gas Corp., 734 F.2d 347, 357 (8th Cir. 1984) (quoting _________ Independent Meat Packers Ass'n v. Bertz, 526 F.2d 228, 239 _______________________________ _____ (8th Cir. 1975) (citations omitted)), cert. denied, 469 U.S. _____ ______ 1158 (1985). The new material, however, should be explanatory of the decisionmakers' action at the time it occurred. No new rationalizations for the agency's decision should be included, see, e.g., Sierra Club v. United States ___ ____ ___________ _____________ Army Corps of Engineers, 771 F.2d 409, 413 (8th Cir. 1985); ________________________ Environmental Defense Fund, Inc. v. Costle, 657 F.2d 275, _________________________________ ______ 285 (D.C. Cir. 1981); Asarco, Inc. v. United States Envtl. ____________ ____________________ Protection Agency, 616 F.2d 1153, 1159 (9th Cir. 1980), and _________________ if included should be disregarded. "If the agency action, once explained by the proper agency official, is not sustainable on the record itself, the proper judicial approach has been to vacate the action and to remand . . . to the agency for further consideration." Costle, 657 F.2d ______ at 285; accord Camp, 411 U.S. at 143; Asarco, Inc., 616 F.2d ______ ____ ____________ at 1159. -27- 27 The district court concluded initially that the administrative record did not contain evidence that the agencies considered the prospect that industries other than light-dry industries might locate on Sears Island. The court explained that [a]lthough i t i s conceivabl e that a careful considerat ion of all available informatio n could h a v e enabled t h e [agencies] rationally t o conclude that the Mallar Report presented a logical basis for determinin g which industries w e r e "reasonabl y foreseeabl e" and could be attributab le to the S e a r s Island p o r t project, -28- 28 the court cannot determine from the record that any such . . . decision w a s "founded o n a reasoned evaluation of the relevant informatio n." Sierra Club IV-C, 714 F. Supp. at 565 (citation omitted). ________________ After reviewing the supplemental affidavits, the court decided that its initial conclusion about the completeness or incompleteness of the administrative record was no longer warranted. See Sierra Club IV-D, 744 F. Supp. at 359. ___ ________________ One reason the court could not initially determine whether the agencies had properly considered all the information before them was that the administrative record reflected that a special report on secondary impacts ("ERA Special Report") was to be prepared, yet the special report was not included in the record and there was nothing in the record to indicate that the proper decisionmakers had ever reviewed that report. See Sierra Club IV-C, 714 F. Supp. at ___ ________________ 563-64. The court later concluded, however, that the -29- 29 supplemental affidavits satisfactorily explained why the administrative record did not include the ERA Special Report -- no separate report was ever prepared. Instead, the report was prepared in "camera ready" form to allow direct incorporation into the EIS. See Mahady Supplemental ___ Affidavit at 6; Richardson Supplemental Affidavit at 10. The affidavits demonstrate that there was an actual agency decision on the scope of the EIS secondary impact analysis. Francis Mahady (Vice-President of Economics Research Associates, the company responsible for preparing the written analysis of the reasonably foreseeable secondary impacts of the port project) attests that he explained his rationale for restricting the analysis to the four light-dry industries, as well as his other conclusions as to secondary impacts, to the appropriate agency decisionmakers. Mahady Supplemental Affidavit at 14. William Richardson (the Division Administrator of the Department of Transportation, Federal Highway Administration, and the person responsible for the administration of the Federal-aid Highway Program in Maine, including compliance with all applicable laws, see ___ Richardson Supplemental Affidavit at 1) explains that he -30- 30 made a deliberate decision to restrict the secondary impact analysis to light-dry industry: Based upon my previous participation in meetings on this issue, upon my review of the Municipal Response Plan, upon Mahady's February 12, 1986 presentation and upon the ensuing discussion among attendees at that February 12 meeting, I thought the choice to be reasonable and sensible. The light, dry industries identified and discussed in the Final EIS (Final EIS at 4-109 to 4-111) appeared to me to be the most probable types of users in light of the various physical and environmental limitations which have to be taken into account in developing Sears Island. Richardson Supplemental Affidavit at 6. The affidavits also provide an explanation for the agencies' decision to restrict the secondary impact analysis to light-dry industries. Mahady describes the "target market analysis" method used to determine the types of industries selected for analysis in the EIS and explains how that method selected the four light-dry industries as likely tenants and eliminated heavy industry as a reasonably foreseeable tenant of Sears Island. Mahady Supplemental Affidavit at 11, 12. Mahady also explains why the agencies no longer consider the development of food and forest product manufacturing as a likely consequence of the port project, id. at 13, and he explains how information ___ -31- 31 on the limited sewer and water capabilities of Sears Island led the agencies to conclude that heavy industry would not develop on Sears Island as a result of the port project, id. ___ at 10. Based on these affidavits, the district court concluded that its questions about whether the agencies' decisionmakers had considered all available information and had made an actual decision to restrict the EIS to light-dry industry had been answered. See Sierra Club IV-D, 744 F. ___ _________________ Supp. at 359. The court further concluded that the agencies' explanation for their decision on the scope of the EIS discussion of secondary impacts was reasonable and supported by credible evidence in the administrative record. See id. ___ ___ We are satisfied that the affidavits explain the agencies' decision in the manner contemplated by Camp v. ____ Pitts. The affidavits do not contain any "facts" about the _____ proposed project that are not also included in the EIS and administrative record. Rather, the affidavits simply explain why, based upon the information in the administrative record and the EIS, the agencies concluded that the four light-dry industries were the only reasonably -32- 32 foreseeable secondary industrial effects of the proposed port project. Sierra Club argues that Camp v. Pitts does not ____ _____ apply to a court's review of an agency decision under NEPA because to allow explanatory affidavits would violate NEPA's goal of public disclosure. As stated in Part V(A), supra, _____ however, NEPA does not require an EIS to discuss how the agency determined the scope of the EIS. Thus, NEPA is not violated when a court relies upon affidavits to explain an agency's rationale for its decision that a certain possible indirect effect of a proposed project is not within the scope of the EIS because it is not "reasonably foreseeable." Moreover, Sierra Club has cited no authority for its assertion that a court should review an agency's decision about what to include in a NEPA-mandated EIS in a manner different from the way courts typically review agency decisions. Sierra Club's assertion that the affidavits are inadmissible because they constitute post-hoc "rationalizations" is similarly without merit. In Overton _______ Park, the Supreme Court specifically anticipated that ____ affidavits containing post-hoc explanations would be considered by courts reviewing the propriety of an agency -33- 33 decision. The solution in such situations is not to ignore the affidavits altogether, but rather to view them "critically." Overton Park, 401 U.S. at 420. The district ____________ court noted this limitation. Sierra Club IV-D, 744 F. Supp. ________________ at 356 n.7. In this case, the agencies' explanations for their decisions were supported by evidence in the administrative record. Sierra Club failed to proffer in the district court any evidence that disputed the agencies' explanations. For example, Sierra Club challenged the credibility of Mahady's assertion that heavy industry could not develop on Sears' Island because of the Island's limited water and sewer capabilities. Sierra Club claimed that a report prepared for the agencies (the Mallar Report) indicates that one million gallons of water per day could be provided to Sears Island. The district court found, however, that the Mallar Report states that "major facility improvements would be required at considerable cost" to provide a million gallons of water a day, and that Sierra Club had offered no evidence to rebut Mahady's conclusion that the large capital expenditures required to make such improvements would render such improvements unlikely. Sierra Club IV-D, 744 F. Supp. ________________ at 358 n.10. In these circumstances, the district court -34- 34 properly accepted the post-hoc explanations of the decisionmakers' action. VI. VI. Application of the Legal Requirements to the Application of the Legal Requirements to the Secondary Impact Analysis in the Challenged EIS Secondary Impact Analysis in the Challenged EIS Sierra Club challenges the agencies' decision to restrict the EIS analysis of secondary impacts to light-dry industries on the ground that "it is too unreasonable for the law to permit it to stand." Sierra Club I, 769 F.2d at _____________ 871. In particular, Sierra Club asserts (1) that it was unreasonable to include the four light-dry industries in the EIS discussion of secondary impacts at all because the development of these industries on Sears Island is not a reasonably foreseeable indirect effect of the port project; (2) that it was unreasonable not to include heavy industry as a reasonably foreseeable indirect effect of the port project; and (3) that it was unreasonable not to include the development of water-dependent industry as a secondary impact. We consider each of these arguments separately. A. A. Sierra Club claims that there is nothing in the EIS or administrative record that supports a conclusion that the port project will "induce" the development of the four light-dry industries on Sears Island. In support of its -35- 35 argument, Sierra Club points out that the final EIS states that the four light-dry industries analyzed as secondary impacts do not require access to water. See Final EIS, Vol. ___ II, F-5 (App. 220). The EIS states also that "due to the high availability of fully serviced industrial park land in the Greater Bangor area" industries that do not require access to water are likely to locate in the Greater Bangor area rather than the Searsport area. See id. at F-2 (App. ___ ___ 204). Sierra Club asserts also that none of the reports before the agencies lists a marine cargo port as a siting factor for any of the four light-dry industries. The agencies concluded that because of the highly competitive nature of industrial park development in Maine, "it was reasonably certain that the industries which ultimately located in the industrial park would be those which both were acceptable to the local population and were the targets of intensive marketing efforts and inducements." Mahady Supplemental Affidavit at 11. This method of determining likely tenants of the industrial park is called "target market analysis." A 1980 Land Use Plan prepared by Bangor Investment Corporation, owner of Sears Island ("Land Use Plan"), includes a marketing study that identifies the four light-dry industries as those "that could best utilize -36- 36 the opportunities offered by the port facility, Sears Island, and the surrounding region, and, in turn, offer the most benefit to the existing region." Land Use Plan at 24 (App. 548). In addition, a 1983 report prepared for the Town of Searsport by Mallar Development Services entitled "A Municipal Response Plan for the Industrial Development of Sears Island" ("Mallar Report"), targets the same four light-dry industries as good candidates for development on Sears Island. Thus, the agencies concluded that because the four light-dry industries are those that local officials and the Sears Island property owners are trying to attract to the industrial park, these industries are reasonably likely to develop on Sears Island. Mahady Supplemental Affidavit at 11. Moreover, although the four light-dry industries do not require access to water, the information before the agencies supports a conclusion that these four industries would benefit from close proximity to the port. The Mallar report observes that these industries would benefit from the transport cost savings associated with a centralized port, see Final EIS, Vol. II, 4-110 (App. 119), because they have ___ significant import/export needs or potential, see, e.g., ___ ____ -37- 37 ERA Special Report at IV-5 to IV-6, IV-8 (App. 456-57, 459). We conclude that it was not arbitrary and capricious for the agencies to include in the EIS discussion of secondary impacts the four light-dry industries targeted in the Mallar Report and the Land Use Plan. This conclusion is consistent with our statement in Sierra Club I that the _____________ Mallar Report and the Land Use Plan --the very reports that identify the four light-dry industries as those most likely to develop on Sears Island -- "are detailed enough for an EIS to describe the type of development likely to occur, ____ even if it is pointless to analyze precise details." Sierra ______ Club I, 769 F.2d at 879. ______ The conclusion in the EIS that "industries that do not require access to water" are likely to locate in Greater Bangor does not make the agencies' decision to include the four light-dry industries in the EIS analysis of secondary impacts arbitrary and capricious. First, not all information in the administrative record must support the agency decision. See Environmental Coalition of Broward ___ ____________________________________ County, Inc. v. Myers, 831 F.2d 984, 986 (11th Cir. 1987) _____________ _____ (citing Bowman Transp., Inc. v. Arkansas-Best Freight ______________________ ______________________ System, Inc., 419 U.S. 281, 285-86 (1974)). Second, when ____________ -38- 38 the conclusion is read in its proper context it does not imply that industries not dependent on water are unlikely to ________ develop on Sears Island. The conclusion compares the attractiveness of Mack Point -- an alternative site to Sears Island -- to the Greater Bangor area. The EIS concludes that Mack Point is not a viable alternative to Sears Island in part because Mack Point does not offer sufficient land contiguous to the port. Thus, industries not dependent on water would be more likely to develop in the Greater Bangor area than in scattered parcels in Searsport near Mack Point. See Final EIS, Vol. II, F-1 to F-2 (App. 203-04). Indeed, ___ that same section of the EIS observes that "[o]nly Sears Island offers sufficient developable industrial land which is contiguous to a prospective port facility." Id. ___ B. B. Sierra Club argues next that the final EIS is inadequate because it repeatedly refers to Searsport as the future site of "heavy industry,"1 yet the EIS secondary ____________________ 1 A report entitled "Where Should Heavy Industry Be Located in Central Maine" defines heavy industry as a development characteristically employing equipment such as, but no (sic) limited to, smoke stacks, tanks, distillation or reaction columns, chemical processing equipment, scrubbing towers, pickling equipment, and waste -39- 39 impact analysis assumes that only light-dry industry is likely to develop on Sears Island. For example, in several places the EIS refers to a 1978 report from the State of Maine Advisory Committee on Coastal Development and Conservation ("Advisory Report") that recommends that heavy industry be clustered in either the Portland-South Portland area or the Searsport-Stockton Springs-Penobscot area. See, ___ e.g., Final EIS, Vol I, 2-3 (App. 91). Moreover, a letter ____ written by Leslie Stevens, Director of the Maine Development Office, states that the proposed Sears Island Industrial Park is intended for heavy industry that needs close proximity to a cargo terminal. See Final EIS, Vol. II, S-2 ___ (App. 226). ____________________ treatment lagoons; which industry, although conceivably operable without polluting or otherwise causing a significant adverse environmental impact on the coastal are[a] (by, but not limited to, the likelihood of generation of glare, heat, noise, vibration, radiation, electromagnetic interference and obnoxious odors) has the potential to pollute or otherwise cause a significant adverse environmental impact. Sierra Club IV-C, 714 F. Supp. at 562 n.27 (quoting Final _________________ EIS at 12-8, as quoted in Plaintiffs' Memorandum in Support of Objections to Defendants' Motion for Summary Judgment at p. 18). -40- 40 The agencies provide two related explanations for their decision not to include the development of "heavy industry" as a reasonably foreseeable indirect effect of the port project. Mahady explains that a key factor in the selection of industries as "reasonably foreseeable" tenants of the industrial park was that "industries locating in the industrial parks had to be those which do not require substantial water and sewer capabilities in order to function," because existing sewer and water facilities are limited. Mahady affidavit at 10 (citing Land Use Plan and Mallar Report). Thus, for Sears Island to accommodate heavy industry "major facility improvements would be required at considerable cost." Id. Because these improvements were not ___ part of the proposed port project, and because the state, county, town, and property owners were unlikely to make such improvements in view of their expense, the agencies concluded that heavy industry was unlikely to locate on Sears Island as a consequence of the port project. See id. ___ __ The use of the "target market analysis" also led the agencies to conclude that "heavy industry" was unlikely to develop on Sears Island as an indirect effect of the port project. As stated in Part VI(A), supra, the local _____ officials and property owners have directed their marketing -41- 41 efforts toward light-dry industries -- not heavy industry. Moreover, because of the environmental effects of heavy industry, the development of such industry on Sears Island would likely meet heavy public opposition. Mahady Affidavit at 9, 12. In sum, the agencies decided that heavy industry was not likely to develop on Sears Island as a result of the port project, despite the Advisory Report's recommendation that heavy industry be clustered in the same area as a cargo port facility, because the available water and sewer facilities on Sears Island are insufficient to support heavy industry, and because the project owners and the town are not directing their marketing efforts at heavy industry. We are satisfied that this decision is not unreasonable. In the alternative, Sierra Club contends that the agencies' conclusion that heavy industry is unlikely to locate at Sears Island is a "substantial revision" to the final EIS requiring the preparation of a supplemental EIS. NEPA regulations mandate -42- 42 a supplemental EIS if one of two conditions is met: (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. 1502.9(c); see also Watt, 716 F.2d at 948. ___ ____ ____ Sierra Club argues that "[i]f the long-established policy of using public funds to build a cargo terminal at Sears Island in order to concentrate heavy industry at that location has been abandoned, then the purpose of the project has fundamentally changed and the public must be informed of that fact through a supplemental EIS." Appellants' Brief at p. 20. We can find nothing in the record to support Sierra Club's assertion that "the purpose of the cargo terminal is to concentrate heavy industry at that location." The 1978 Advisory Report recommends that heavy industry and port facilities be clustered together in two areas of the state in order "to ensure that more than 95% of Maine's 3,000 mile coastline would be free of heavy industries and major port activities." Final EIS, Vol. I, 2-3 (App. 91). It does not follow from this recommendation that the purpose of the port project is to induce heavy industry to locate on -43- 43 Sears Island. Nor does it follow from the agencies' conclusion that heavy industry is unlikely to develop on Sears Island as a consequence of the port project that Maine has abandoned its clustering policy. Thus, there is no need to issue a supplementary EIS. C. C. Sierra Club claims that the development of water- dependent industry is a reasonably foreseeable indirect effect of the port project. See, e.g., Final EIS, Volume ___ ____ II, F-2 (App. 203) ("there are really two classes of industries likely to locate at or near the cargo port facility proposed for Searsport: [the first of which is] those industries engaged in intensive handling of waterborne commerce which require direct proximity to the port facility, since greater distance from the port would add transportation costs which would make their operations infeasible . . . ."). Although Sierra Club does not identify what types of water-dependent industries it believes the EIS should have discussed, it does identify a 1987 study excerpted in the EIS that analyzes the water-dependent industries that have developed at port projects comparable to the Searsport proposal. See Final EIS, Vol I, 4-149 to 4-151 (App. 158- ___ -44- 44 60). The study found that auto processing, stevedoring, and chemical industries developed at Colonels Island, Georgia, and that industries involving bananas, phosphates, stevedoring, and ship repair developed at Port Manatee, Florida. See id. Sierra Club appears to contend that the ___ ___ EIS should have discussed these industries as reasonably foreseeable secondary impacts, or at the very least, discussed why they are not reasonably foreseeable. The agencies respond that the EIS discusses industries that rely upon water commerce as a direct -- rather than indirect -- effect of the port project; therefore there is no reason to discuss these industries as secondary impacts. As support for their response, the agencies cite to Sierra Club IV-D, 744 F. Supp. 357 n.9, and ________________ to page 94 of the appendix on appeal. In Sierra Club IV-D, the district court observed ________________ that although the agencies had originally anticipated that forest product and food industries would locate facilities on Sears Island, the secondary impacts analysis does not discuss these industries. The court concluded, however, that the final EIS does not discuss the manufacturing of food and forest products because "primary manufacturing production facilities . . . tend to be located in as close a -45- 45 proximity as possible to their raw materials." Sierra Club ___________ IV-D, 744 F. Supp. at 357 n.9 (quoting Mahady Supplementary ____ Affidavit at 13). The agencies determined that these industries would utilize storage facilities in the port complex. The final EIS considers impacts related to the storage of forest and food products in its discussion of the direct impacts of the project. See id. (citing Final EIS, ______ ___ ___ Vol. 1, 2-12, 4.4.2, 4.8.2). The document at page 94 of the appendix is a diagram of the placement of the storage facilities at the port. The agencies' identification of the EIS diagram and note nine of Sierra-Club IV-D, is not _________________ completely responsive to Sierra Club's argument. The fact that the agencies considered the effects of forest and food products industries -- two industries that rely upon water commerce, see Sierra Club IV-C, 714 F. Supp. at 565 -- does ___ ________________ not explain why the EIS does not include an analysis of other water-dependent industries, such as the industries identified in the 1987 study of comparable ports. Nonetheless, we conclude that the EIS analysis of secondary impacts is adequate. First, Sierra Club has not called our attention to any record that it made this argument in the district court. Neither the district court's decision allowing Sierra Club's -46- 46 motion for a preliminary injunction, see Sierra Club IV-C, ___ ________________ 714 F. Supp. at 559-65, nor the court's decision on the cross-motions for summary judgment, see Sierra Club IV-D, ___ _________________ 744 F. Supp. at 354-60, discusses any contention by Sierra Club that the EIS evaluation of the port project's secondary impacts is inadequate because it does not evaluate water- dependent industries (other than food and forest manufacturing). Absent an exceptional circumstance -- and none appears here -- an appellate court will not consider arguments that were not made to the trial court. See, e.g., ___ ____ Borden v. Secretary of Health & Human Services, 836 F.2d 4, ______ ____________________________________ 6 (1st Cir. 1987); Johnston v. Holiday Inns, Inc., 595 F.2d ________ __________________ 890, 894 (1st Cir. 1979). Second, NEPA requires an EIS to evaluate only those secondary impacts that are reasonably foreseeable. We conclude that it was permissible for the agencies not to analyze other water-dependent industries, such as auto processing, petroleum, and cement, because the likelihood of these industries developing on Sears Island is too speculative to be reasonably foreseeable. The only evidence Sierra Club identifies (other than general statements to the effect that water-dependent industries are likely to develop) is the study of comparable ports around the United -47- 47 States. The fact that auto processing developed as an indirect effect of a port project in Georgia, for example, does not, without more, make the development of auto processing on Sears Island reasonably foreseeable. D. D. Accordingly, we conclude that the agencies' decision to restrict the EIS secondary impact analysis to the four light-dry industries is reasonable in light of the findings in the Mallar Report, the Land Use Plan, and the environmental and physical limitations of Sears Island. We observe that it does not matter whether we, or the district court, would have reached the same decision as the agencies. Our only role, and that of the district court, is to satisfy ourselves that the agencies have "made a reasoned decision based on [their] evaluation" of the information before them. Oregon Natural Resources Council, 490 U.S. at 378. We are ________________________________ so satisfied. VII. VII. Conclusion Conclusion We conclude that the agencies' decision to restrict the EIS analysis of secondary impacts to the four light-dry industries is permissible. In other words, the decision is not too unreasonable for the law to permit it to stand. See Sierra Club I, 769 F.2d at 871. We conclude ___ _____________ -48- 48 also that the district court did not err in admitting and considering the agencies' affidavits pursuant to Camp v. ____ Pitts. We can find nothing in NEPA, its regulations, or _____ case law, that would allow us to conclude that a court reviewing an agency's decision about the scope of a NEPA- mandated EIS may not consider affidavits that explain the basis for the agency's decision. Affirmed. Costs to appellees. ________ __________________ -49- 49