**TOWN OF HINGHAM, A Municipal Corporation, Plaintiff,**

v.

**Rodney E. SLATER, et al., Defendants.**

**No. Civ.A. 96–11650–RCL.**

United States District Court,
D. Massachusetts.

May 30, 2000.

Andrea C. Ferster, Washington, DC, Peter L. Puciloski, Hovey & Koenig, LLP, Boston, MA, for Town of Hingham.

Edward A. Boling, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, DC, for Gordon Linton, Richard Koyle, Rodney E. Slater.

Elizabeth S. Merritt, National Trust for Historic Preservation in the U.S., Washington, DC, Peter L. Puciloski, Hovey & Koenig, LLP, Boston, MA, for National Trust for Historic Preservation.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

Before the court are cross motions for summary judgment filed by the plaintiff (docket no. 109) and the defendants (docket nos. 122 and 129). These motions were referred to Chief Magistrate Judge Robert B. Collings for a report and recommendation. Judge Collings, in a detailed report, recommended that the motion for summary judgment of the plaintiff be denied, that the motions of the defendants be granted, and that judgment be entered in favor of the defendants as a matter of law. The plaintiff filed a timely objection to both recommendations. On May 8, 2000, however, the plaintiff notified the court that the plaintiff has withdrawn its objection to the report of Judge Collings and to the entry of judgment as recommended in the report.

Accordingly, the court adopts, as its ruling in this case, the report and recommendation of Judge Collings and directs the clerk to enter judgment in favor of the defendants in accordance with that report.

SO ORDERED.

## REPORT AND RECOMMENDATION ON PLAINTIFF'S AMENDED MOTION FOR SUMMARY JUDGMENT (#109), MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S MOTION FOR SUMMARY JUDGMENT (#122) AND FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (#124)

COLLINGS, Chief United States Magistrate Judge.

### I. Introduction

This case now comes before the Court on motions for summary judgment filed by all parties which have been referred to the undersigned for the issuance of findings of fact and recommendations as to disposition pursuant to 28 U.S.C. § 636(b).[1] This civil action was instituted in mid–August, 1996, with the filing of the original complaint by the plaintiff, Town of Hingham (hereinafter "Hingham"), as against the defendants Federico Pena[2] in his official capacity as the Secretary of the U.S. Department of Transportation, Gordon Linton in his official capacity as the administrator of the Federal Transit Administration (hereinafter "FTA"), Richard Doyle in his official

---

1. Portions of this opinion are borrowed verbatim from a previously issued Memorandum and Order On Defendants' Joint Motion To Strike (# 106).

2. The current Secretary of the U.S. Department of Transportation is Rodney E. Slater. Mr. Slater was substituted for Mr. Pena in the Amended Complaint. (*See* # 57)

capacity as the regional administrator of the FTA (hereinafter collectively "the federal defendants"), and James J. Kerasiotes [3] in his official capacity as Chairman of the Massachusetts Bay Transportation Authority (hereinafter "MBTA"). Hingham seeks declaratory and injunctive relief to stop construction of the Greenbush Line of the Old Colony Railroad Rehabilitation Project until such time as the defendants have complied with the requirements of certain federal laws alleged to be applicable to the project, to wit, Section 4(f) of the Department of Transportation ("DOT") Act, 49 U.S.C. § 303 (hereinafter "Section 4(f)"), Section 106 of the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470f, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C).

In October of 1996 the federal defendants joined in a motion to dismiss the complaint while the sole state defendant filed a separate comparable motion. In a report and recommendation that was subsequently accepted by the District Judge to whom this case is assigned, it was recommended that the dispositive motion submitted by the MBTA be denied and that the federal defendants' motion be allowed to the extent that dismissal was sought pursuant to Rule 12(b)(1), Fed.R.Civ.P., and otherwise denied. It was further recommended that the plaintiff be afforded the opportunity to file an amended complaint in order to cure the jurisdictional infirmity.

In due course Hingham filed its Amended Complaint For Declaratory And Injunctive Relief (# 57) as to which the defen-

dants filed their respective answers. ( 58, 67) The administrative record was compiled and submitted on or about April 30, 1998.(# 71) [4] Approximately two months later Hingham filed a motion to supplement the administrative record (# 74) which the federal defendants opposed.(# 75) That motion was denied without prejudice by Judge Lindsay in mid-July, 1998. Shortly thereafter on or about August 7, 1998, the plaintiff filed another motion to supplement the administrative record (# 78) and, once again, the federal defendants objected. (# 81) After being referred to the undersigned for decision, that second motion, too, was denied after a hearing on December 28, 1998.

During a telephone conference in early January of this year, although the parties seemed to share the view that this case should be resolved via summary judgment motions, Hingham contended that documents outside the administrative record could be considered in deciding such motions while the defendants disagreed. Essentially this was the same issue raised by the prior motions to supplement albeit dressed in a different guise. In an effort finally to join this issue for ultimate resolution, the plaintiff was granted leave to file a motion for summary judgment together with a memorandum and materials in support by the close of business on January 27, 1999, and, by February 17, 1999, the defendants were granted leave either to file a motion to strike or a cross-motion for summary judgment. Hingham was to file any opposition to the defendants' submission by March 10, 1999.

---

**3.** Patrick J. Moynihan succeeded Mr. Kerasiotes as the Chairman of the Massachusetts Bay Transportation Authority and consequently was substituted as a party defendant in the amended complaint. (*See* # 57) The current Chairman and Chief Executive Officer of the Massachusetts Bay Transportation Authority is Kevin J. Sullivan. (*See* # 121 at 3)

**4.** It is undisputed that the FTA has compiled and certified an Administrative Record consisting of two volumes:

> Volume I consists of a single bound volume including documents identified at Tabs 1 through 15, and cited accordingly. Volume II consists of various documents published as part of the environmental review for the restoration of service on various lines of the former Old Colony railroad, found at Exhibits A through D.

Defendants' Joint Statement # 134 ¶ 1; Plaintiff's Response # 130 ¶ 1.

The defendants opted to file a motion to strike and after a hearing, on May 11, 1999, a Memorandum and Order (# 106) issued wherein that joint motion was allowed with respect to nine of the eleven proposed exhibits, reserved with respect to another and denied with another.[5] Eighteen days later Hingham filed an amended motion for summary judgment (# 109) together with an amended memorandum in support (# 110) and an amended statement of facts (# 111). The defendants submitted a joint response to the plaintiff's amended statement of facts (# 121) as well as separate motions for summary judgment ( 122, 124) and supporting papers ( 123, 125, 126[6]). The plaintiff filed a memorandum in opposition to the defendants' dispositive motions (# 129), and both the state defendant and the federal defendants filed reply briefs ( 133, 135). Oral argument was heard on October 5, 1999, and the three summary judgment motions now stand ready for resolution.

## II. The Facts

Generally speaking there is little dispute with respect to the historical facts underlying this case. To the extent that any such disagreement does exist, it shall be duly noted.

At the outset, an identification of the players is in order. Established in 1635, Hingham is the northern-most town in Plymouth County, 18 miles southeast of Boston by land and 11 miles southeast by water. (Plaintiff's Amended Statement Of Material Facts # 111 ¶ 1;[7] Defendants' Joint Response # 121 at 1)[8] According to the plaintiff, this law suit was instituted "to protect the safety, health, and welfare of citizens, which [the Town] believes will be adversely affected by the proposal to construct the Greenbush Line of the Old Colony Railroad Rehabilitation Project at grade." (# 111 ¶ 1; # 121 at 1) The parties concur that the FTA

is the exclusive funding agency within the United States Department of Transportation that is responsible for reviewing and processing all applications for urban mass transportation capital and operating assistance grants and loans under its authorizing legislation, now codified at 49 U.S.C. § 5301, *et seq.*

Defendants' Joint Statement # 134 ¶ 2; Plaintiff's Response # 130 ¶ 2. Similarly it is agreed that the

MBTA is an "independent body politic and corporate and political subdivision of the Commonwealth" of Massachusetts which was established in accordance with Mass. General Laws, Chapter 161A to develop, finance, and operate mass transportation facilities and equipment within certain designated cities and towns in the Boston Region, including the communities within the area to be served by the proposed Greenbush Line project.

Defendants' Joint Statement # 134 ¶ 3; Plaintiff's Response # 130 ¶ 3.

Approximately fifteen years ago the MBTA advanced a proposal denominated the "Old Colony Railroad Rehabilitation Project" as a means to enhance the then-existing commuter rail system by restoring service to southeastern Massachusetts which had been discontinued in 1959. (# 111 ¶ 19; # 134 ¶ 7) The former Old Colony lines included rail lines from South Station in Boston to terminals in Middle-

---

**5.** That particular exhibit, the declaration of Katharine Reardon, will be considered only on the issue of standing.

**6.** The defendants also filed a joint statement of undisputed material facts (# 134) as to which Hingham filed a response (# 130).

**7.** In their respective statements, the parties cite to portions of the Administrative Record in support of their proposed facts. Throughout this recitation, reference shall be made primarily to the paragraphs of the statements, not to the foundational materials.

**8.** In their joint response, the defendants only address those proposed facts which they dispute. (*See* # 121 at 1 n. 1)

borough/Lakeville ("the Middleborough Line"), to Plymouth/Kingston ("the Plymouth Line"), and to Scituate ("the Greenbush Line"). (# 111 ¶ 20; # 134 ¶ 7) To more fully paint the picture, the Old Colony Main Line, approximately ten miles in length, runs from Braintree to South Station in Boston, parallel and adjacent to the MBTA's Red Line rapid transit system. (# 134 ¶ 9; # 121 ¶ 9) [9] The twenty-five mile long Marlborough Line runs from the Marlborough/Lakeville area with five intervening stops to Braintree and then continues service to South Station. (# 134 ¶ 10) [10] The Plymouth Line is likewise about twenty-five miles long, running from Plymouth/Kingston to Braintree with five intermediate stations and then continuing service to Boston. (# 134 ¶ 11) [11] The Greenbush Line measures about seventeen and seven-tenths mile in length and is a proposed rail right of way that would begin in Scituate, connect with the Old Colony Main Line at Braintree Wye, and then continue service into South Station in Boston. (# 134 ¶ 12) [12]

The Old Colony Feasibility Study was undertaken and, when completed in 1986, concluded that restoration of the rail lines was feasible and warranted further investigation. (# 134 ¶ 7; # 130 ¶ 7) After reviewing the Feasibility Study, the Governor and legislature of Massachusetts "directed the MBTA to proceed with environmental studies required to restore commuter rail service on the Old Colony Lines." (# 111 ¶ 21; # 134 ¶ 7)

The Urban Mass Transportation Administration (hereinafter "UMTA"), the predecessor to the FTA, agreed formally to work with the MBTA in undertaking the project in mid–1986. (# 111 ¶ 22) The following is part of the text of a notice filed in the Federal Register on April 4, 1988:

The Urban Mass Transportation Administration (UMTA) and the Massachusetts Bay Transportation Authority (MBTA) are undertaking the preparation of an Environmental Impact Statement (EIS) for proposed transit improvements to the area south of Boston bounded on the west by Route 24, to the east by Massachusetts Bay, and to the south by the Cape Cod Canal.

Administrative Record, Vol. I, Exh. 15.

Numerous alternative means of transportation to southeastern Massachusetts were screened, analyzed and considered by the MBTA and UMTA during the study. (# 111 ¶¶ 23, 24; # 134 ¶ 14)

In May of 1990, the 1990 DEIS/R [13] was issued followed by a 76–day public comment period and three public hearings. (# 134 ¶ 15; # 130 ¶ 15) According to the 1990 DEIS/R, the alternatives considered for improving the transit system to southeastern Massachusetts included the following:

1 —No–Build

---

9. Hingham "disputes any implication that the ten-mile Old Colony "Main Line" ... was ever intended to operate as a stand-alone project independent of one or more branch lines, or that Braintree Station was ever considered to be an end terminal for any of the Old Colony Lines." (# 130 ¶ 9)

10. Hingham disputes the characterization of the Marlborough Line as anything less than a rail line from Middleborough to Boston in its entirety or different from the twenty-five mile segment from Middleborough to Braintree plus the ten mile segment from Braintree to Boston inclusive. (# 130 ¶ 10)

11. Hingham disputes the characterization of the Plymouth Line as anything less than a rail

line from Plymouth to Boston in its entirety or different from the twenty-five mile segment from Plymouth to Braintree plus the ten mile segment from Braintree to Boston inclusive. (# 130 ¶ 11)

12. Hingham disputes the characterization of the Greenbush Line as anything less than a rail line from Scituate to Boston in its entirety or different from the approximately eighteen mile segment from Plymouth to Braintree plus the ten mile segment from Braintree Wye to Boston inclusive. (# 130 ¶ 11)

13. These initials stand for Draft Environmental Impact Statement/Report.

2 —Transportation Systems Management

3a—Commuter Rail Service from Boston to Middleborough

3b—Commuter Rail Service from Boston to Middleborough and Plymouth

3c—Commuter Rail Service from Boston to Middleborough and Greenbush (Scituate)

3d—Commuter Rail Service from Boston to Middleborough, Plymouth & Greenbush (Scituate)

Old Colony 1990 DEIS/R at ii.

The parties agree that the same six alternatives [14] were studied and evaluated in the 1990 DEIS/R and in the 1992 FEIS/R.[15] (# 134 ¶ 18; # 130 ¶ 18). There is also no dispute that the preferred alternative selected was a modified version of Alternative 3b, Commuter Rail from South Station to Middleborough and Plymouth, and that the FEIS/R addressed "comments received on the Main Line, the Middleborough Line, and the Plymouth Line, the three commuter rail elements of modified Alternative 3b". (# 134 ¶ 19; 130 ¶ 19; 1992 FEIS/R at ES–5) The preface of the 1992 FEIS/R reflects that

A decision was made to defer a decision on the Greenbush Line because of a significant number of unresolved environmental concerns. The Middleborough and Plymouth Lines function independently. Their implementation will have no bearing on whether or not the Greenbush Line is subsequently adopted. There are significant benefits which can be realized by adopting the Middleborough and Plymouth Lines only.

1992 FEIS/R at vii.

It was also noted in the 1992 FEIS/R that

The Greenbush Line is a fourth commuter rail element making up a more extensive project described in Alternative 3d "Commuter Rail Service from Boston to Middleborough, Plymouth and Greenbush (Scituate)". Although the Greenbush Line remains an important future possible commuter rail corridor, environmental studies for the other Old Colony rail corridors, the Main, Middleborough and Plymouth Lines, are now prepared and are unencumbered by unresolved issues. Therefore the MBTA is proposing a current action project, restoration of commuter rail service to Boston on the Middleborough and Plymouth Lines that meet regional and MBTA goals by providing mass transit options to more than two thirds of the Old Colony area, improves air quality, brings other important transportation benefits to 26 communities in the Old Colony area and can be advanced immediately towards implementation.

1992 FEIS/R at vii and ES–5.

It was further stated that

[i]n order that the potential impacts of the Greenbush Line and other alternatives for service in the Greenbush corridor be properly assessed, a supplemental environmental document will be prepared which fully assesses the impacts of the Greenbush Line and fully evaluates the effectiveness of mitigation options.

1992 FEIS/R at II–85.

On June 10, 1992, the FTA issued a Record of Decision (hereinafter "ROD") which concluded "that the requirements of the National Environmental Policy Act of 1969 (NEPA) had been satisfied" with regard to Alternative 3b (Modified), to wit, the Old Colony Main, Middleborough and

---

**14.** It is explained in the 1992 FEIS/R that:

Initially, the alternatives were defined to consider the use of all three branch lines in each alternative with terminal locations being varied. During the course of the study, this definition of alternatives was revised to consider the use of one or more of the branch lines in their entirety.

1992 FEIS/R at II–34.

**15.** These initials stand for Final Environmental Impact Statement/Report.

Plymouth Lines. (# 111 ¶ 38; # 134 ¶ 21; # 130 ¶ 21) It was noted in the ROD that "[t]he Greenbush Line is still under study but will be the subject of separate environmental documents, including a 4(f) evaluation, should it ever be advanced." (Record of Decision, Exh. 11 at 4; # 111 ¶ 39) The FTA's decision to approve and fund the Main, Middleborough and Plymouth lines separately from the Greenbush Line has never been challenged by Hingham. (# 134 ¶ 23; # 130 ¶ 23)

According to Richard H. Doyle, the Regional Administrator for Region 1 of the FTA,

> Before FTA may award a grant for capital or operating assistance, fair and equitable arrangements must be made to protect the interests of transit employees affected by the proposed FTA assistance. Those arrangements must be certified by the U.S. Department of Labor (DOL) as meeting the requirements of 49 U.S.C. § 5333(b). In fact, the initial awards of Federal financial assistance for the Main, Middleborough and Plymouth Lines on March 22, 1994, were delayed for nearly two years after issuance of the June 10, 1992, Record of Decision (Tab 11), pending DOL certification. The DOL certification is strictly limited to the Main, Middleborough and Plymouth Lines.

Declaration of Richard H. Doyle # 126 ¶ 9 (citations to Administrative Record omitted); # 134 ¶ 34; # 130 ¶ 34.

Ultimately capital grants of approximately $384 million were approved by the FTA for the Main, Marlborough and Plymouth Lines. (# 111 ¶ 41) [16] It is uncontested that the FTA funding for these three lines was comprised of grants for final design, right-of-way acquisition and construction, and that all of the grant funds that were sought by the MBTA have been awarded by the FTA. (# 134 ¶¶ 24, 26; # 130 ¶¶ 24, 26) Similarly there is no dispute that construction on the Main, Middleborough and Plymouth Lines has been completed and, in fact, that commuter rail service on those lines commenced in September of 1997. (# 134 ¶ 26; # 130 ¶ 26)

In March of 1995, the FTA and MBTA issued a Supplemental Draft Environmental Impact Statement/Report and Section 4(f) Evaluation for Transportation Improvements in the Greenbush Line Corridor (hereinafter "SDEIS/R") which had "been prepared to satisfy the requirements of the National Environmental Policy Act, the Department of Transportation Act, and the Massachusetts Environmental Policy Act". (1995 SDEIS/R at xv; # 111 ¶ 42; # 134 ¶ 36) Different transportation alternatives were evaluated in the SDEIS/R, including a commuter rail alternative incorporating four variant tunnel configurations. (# 134 ¶ 36; # 130 ¶ 36) A preferred alternative was to be selected by the MBTA following public comment on the SDEIS/R. (# 134 ¶ 37; # 130 ¶ 37) It was stated in the SDEIS/R:

> Since no dedicated sources of funding have yet been identified for the Greenbush project, the additional capital and operating costs for each Greenbush Line corridor project alternative are compared against the results of the financial model to determine their impact on average annual state assistance to the MBTA. While this approach is not intended to imply that all Greenbush project costs will necessarily be funded locally, it does provide a basis for comparing financial impacts among the alternatives. By assuming zero additional federal support for the Greenbush project, this approach also provides a highly conservative set of assumptions

---

16. The defendants assert that "FTA has never obligated any federal funding whatsoever for the Greenbush Line" and that, in fact, "MBTA has never applied to FTA for any funds, whether for planning, design or construction, for the Greenbush Line." (# 134 ¶ 35) Hingham contests these statements because, in the Town's view, "[t]he MBTA has applied to the FTA for funding, and the FTA has obligated federal funding, to construct the Main Line, which is an integral and inseparable component of the Greenbush Line." (# 130 ¶ 35)

used to analyze the financial impacts of each alternative. No attempt is made to develop a financing plan for the Greenbush project; such a plan will be prepared once a locally preferred alternative is prepared.

1995 SDEIS/r at VI–2.

About three and a half years after the issuance of the June, 1992 R.O.D., by letter dated January 22, 1996, the MBTA advised the FTA that it would "no longer be seeking federal transit funding assistance for the costs of the Greenbush Project" because it had been determined that the project would be wholly state funded. (# 134 ¶ 39; # 130 ¶ 39) In a February 14, 1996 letter, the FTA Regional Administrator responded to the MBTA, stating that "[b]ased upon your notification, the FTA intends to terminate the federal environmental review process and will publish a notice to that effect in the Federal Register." (# 134 ¶ 40; # 130 ¶ 40) Indeed on February 21, 1996 a notice was published in the Federal Register which read, in part, as follows:

> Notice is hereby given that the Federal Transit Administration (FTA) is cancelling its preparation of an Environmental Impact Statement for transportation improvements in the Greenbush Corridor linking the coastal communities of Braintree, Weymouth, Hingham, Cohasset, and Situate, Massachusetts. The project sponsor, the Massachusetts Bay Transportation Authority (MBTA), has announced its intention not to seek Federal financial assistance from FTA in constructing improvements in the Greenbush Corridor.

Administrative Record, Exh. 2; # 134 ¶ 41; # 130 ¶ 140.

### III. Discussion

At issue in this litigation is the decision by the FTA to discontinue its environmental analysis of the Greenbush Line. In other words, the FTA determination that absence a request for federal funding, the Greenbush Line was not a "major federal action" such as would subject the project to the mandates of the Department of Transportation Act, NEPA, or the National Historic Preservation Act is being challenged by Hingham as "arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law." (# 57 ¶¶ 37, 45, 54)

Jurisdiction over this matter is predicated under 28 U.S.C. § 1331(a), 28 U.S.C. §§ 2201–2202, 28 U.S.C. § 1361 and 5 U.S.C. § 702[17]. It is important to bear in mind the scope of judicial review to be exercised in a case such as this:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> \*    \*    \*    \*    \*    \*
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Title 5 U.S.C. § 706.

The First Circuit has quite recently expounded on the court's role under the law:

---

**17.** As explained by the First Circuit:

In 28 U.S.C. § 1331 (1982), Congress has provided federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." Although broad, this grant by itself does not provide jurisdiction for actions against the United States. As is well settled by now, "[t]he United States, as sovereign, is immune from suits save as it assents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941) (citations omitted). Congress, through 5 U.S.C. § 702 (Supp.III 1986), has waived sovereign immunity for those claims arising under section 1331 that seek "relief other than money damages." *MacMann v. J.R. Titus,* 819 F.2d 8, 9–10 (1 Cir.1987).

Judicial review of a federal agency's compliance with NEPA is governed by section 10 of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A). *See Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir.1992) (*"Sierra Club II"*) (*citing Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 375, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Under that section, the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Sierra Club II*, 976 F.2d at 769. "The task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and 'articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Penobscot Air Servs., Ltd. v. Federal Aviation Admin.*, 164 F.3d 713, 719 (1st Cir.1999) (*citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (citation and internal quotation marks omitted)). The reviewing court must determine whether the decision was based on a consideration of the relevant factors and whether the agency made a clear error of judgment. *See Oregon Natural Resources Council*, 490 U.S. at 378, 109 S.Ct. 1851 (*citing Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on unrelated grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)); *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir.1996), *cert. denied*, 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997).

While this is a highly deferential standard of review, it is not a rubber stamp. *See Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir.1995). The reviewing court must undertake a "thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Volpe*, 401 U.S. at 415–16, 91 S.Ct. 814. Only by carefully reviewing the record and satisfying itself that the agency has made a rational decision can the court ensure that agency decisions are founded on a reasoned evaluation of the relevant factors. *See Oregon Natural Resources Council*, 490 U.S. at 378, 109 S.Ct. 1851; *Penobscot Air Servs.*, 164 F.3d at 720.

*Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202–03 (1 Cir., 1999); *see also Sierra Club v. Marsh*, 976 F.2d 763, 769 (1 Cir., 1992); *Ross v. Federal Highway Administration*, 162 F.3d 1046, 1050 (10 Cir., 1998) ("Under the APA, we may set aside the agency's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.").

The key question upon which this case turns is whether the rehabilitation of the Greenbush Line is or ever was a major federal action, for if it is not, the requirements of federal statutes simply do not apply. Indeed, as explained by one court:

NEPA requires that federal agencies consider the environmental consequences of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Thus the threshold issue in this case is whether, at this point, there is sufficient federal involvement in the Light Rail Project to constitute major federal action affecting the environment under NEPA.

*Macht v. Skinner*, 916 F.2d 13, 15 (D.C.Cir., 1990) (footnote deleted). As a fact-bound inquiry, resolution must be found by reviewing the Administrative Record.

Hingham's primary contention is that the Greenbush Line is part of the whole Old Colony Rehabilitation Project which

was intended to revitalize all of the rail lines to southeastern Massachusetts. It is argued that although the Greenbush Line was essentially severed from the project in 1992, at that time, the federal government committed to undertaking environmental studies on the rail line if or when construction was to begin in the future. Moreover, because the federal government provided financial assistance for the construction of the Main Line, which, by Hingham's definition, is part of the Greenbush Line, the plaintiff asserts that the Greenbush Line has been federalized.

The record reveals that rehabilitation of the Greenbush Line represented an option in only one of the six alternatives that were analyzed in the 1990 DEIS/R and 1992 FEIS/R. While the Greenbush Line was clearly a part of the Old Colony Rehabilitation Project, the inference must readily be drawn that it was not an indivisible part. This assumption is underscored by the fact that the preferred alternative, modified alternative 3b, included the Main Line, the Middleborough Line and the Plymouth Line but not the Greenbush Line. Modified alternative 3b was then defined as "the project". The ROD issued by the FTA approved only those three rail elements. The MBTA sought federal funds solely for the Main, Middleborough, and Plymouth Lines. The MBTA has never applied for, nor has the FTA allocated, any federal funding at any time for the Greenbush Line. As confirmed by the FTA Regional Administrator:

All grant funds obligated for construction of rail restoration were awarded exclusively for the Main, Middleborough and Plymouth Lines. The FTA has never obligated any funds whatsoever for the Greenbush (sic) Line. The FTA has never received from the MBTA an application for federal assistance for any aspect of the planning, design or construction of the Geeenbush (sic) Project.

Federal Defendants' Reply # 135, Declaration Of Richard H. Doyle ¶ 5. The Town asserts that the FTA maintains control over the Greenbush Line by virtue of the federal grants received for the other three rail lines, however, this contention is belied by the record evidence. See Declaration Of Richard H. Doyle # 126 ¶¶ 4–14.

Although Hingham views the Main Line as part of the Greenbush Line, it most certainly has a function apart the Greenbush Line, that being, of course, servicing commuters on both the Middleborough and Plymouth Lines. The present scenario is similar to that in an earlier First Circuit case:

Appellant relies on several factors to make the project "federal", all but one of which can be disposed of briefly. Appellant was unable to convince the district court that the previously constructed Inner Taxiway and the Outer Taxiway here involved are so interrelated as to make the latter a federal project because federal funds helped to finance the former. We do not accept the general proposition that once the federal government has participated in a development, that development is necessarily forever federal. Many projects have federal assistance at an exploratory stage and are then completed through wholly local or state funding. The question, then, is a factual one, and nothing in the present record persuades us that these projects, for funding purposes separate, should be treated as one for the purpose of identifying the time when the action of the Port Authority becomes federal action.

City of Boston v. Volpe, 464 F.2d 254, 257–8 (1 Cir., 1972).

The same holds true in the instance circumstances. It does not inexorably follow that because a less broad alternative was chosen, i.e., modified alternative 3b, that the most extensive alternative, alternative 3d which included the Greenbush Line, was forever federalized. Because the federal government participated in the rehabilitation of the Main, Marlborough and Plymouth Lines does not mean that any reconstruction of the Greenbush Line is a federal action.

In sum, there is no basis in the record for determining that the FTA's decision to cancel the preparation of an EIS for the Greenbush Corridor was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." In other words, the record supports the FTA's conclusion that the Greenbush Line is not nor ever was a major federal action. With this decision, no other arguments advanced by the parties need to be addressed. The defendants are entitled to the entry of judgment in their favor as a matter of law.

### IV. Recommendation

Accordingly, I RECOMMEND that Plaintiff's Amended Motion For Summary Judgment (# 109) be DENIED, that Massachusetts Bay Transportation Authority's Motion For Summary Judgment (# 122) be ALLOWED, and that the Federal Defendants' Motion For Summary Judgment (# 124) be ALLOWED. I RECOMMEND that summary judgment enter for the defendants.

### V. Review by the District Judge

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Clerk within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980). *See also*

*Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Dec. 3, 1999.